**STATE of Iowa, Appellee,**

v.

**Gary HARVEY, Appellant.**

**No. 57508.**

Supreme Court of Iowa.

May 19, 1976.

Michael J. Laughlin, of Erickson, Seckington, Laughlin & Huston, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., Earl Roberts, Jr., Asst. Atty. Gen., Ray A. Fenton, County Atty., for appellee.

Heard before MOORE, C. J., and MASON, RAWLINGS, LeGRAND and REES, JJ.

MASON, Justice.

April 3, 1974, a county attorney's information was filed in the Polk District Court charging Gary Sylvester Forrester and Gary Warren Harvey with the crime of robbery with aggravation as defined in sections 711.1 and 711.2, The Code. Defendants plead not guilty and were jointly tried to a jury. In this opinion we are concerned only with Gary Harvey's appeal from the judgment imposing sentence on his conviction by the jury of the crime charged.

He contends the trial court erred: (1) in refusing on relevancy grounds to allow his attorney to cross-examine the robbery victim regarding the victim's present and past physical and mental health as bearing on his competency as a witness to testify; (2) in failing to suppress all testimony relative to what Des Moines police officers found and testified to as a result of a search of Harvey; and (3) in failing to sustain defendant's motion for a directed verdict based on the insufficiency of evidence.

The record discloses that Daniel Barrows of Omaha, Nebraska, had traveled to Ames to attend a wrestling tournament. Unable to find overnight lodging in Ames, he drove to Des Moines and registered at the Holiday Inn Central about 11:00 p. m. March 14, 1974. After drinking a Coke in the lounge,

Barrows proceeded to his room. About 1:00 a. m. (March 15) he realized he had forgotten his shaving kit in his car, so he went to the motel parking lot to retrieve it.

Upon reaching the parking lot, Barrows was approached by two people who requested the location of Walnut Street. When Barrows replied he did not know, one of the men showed him a "tow bar" (exhibit 1) and demanded money. Before the victim could finish stating he needed his money to pay for the motel room, he was struck on the head. Barrows fell to the ground, but remained sufficiently conscious to hand the robbers his billfold and observe them flee to a "red-orange" Gremlin and drive away. Barrows, whose glasses had apparently been knocked off in the fracas, could not decipher the license number.

Barrows retrieved his glasses, went back into the motel and told a police officer there present what had occurred. The assailants were described as two black youths, one of whom was missing a tooth. Barrows also described the "instrument" used and, presumably, the fact a red Gremlin was used in the getaway. It was brought out at trial the billfold contained a traveler's check, draft card, driver's license, bank card and about fifty dollars. Barrows, however, had told the police officer he did not know the exact amount of money.

In response to a radio transmission dispatched from the Des Moines police department at 1:37 a. m. March 15 that an armed robbery had just been committed at the Holiday Inn Central by two black males who had made their escape in a red Gremlin police officer William Groves drove directly from his position on Sixth Avenue and Keo to the area located around Robert's Lounge on Eleventh and University Avenue. At this point the police officer observed a red two-door Gremlin leaving the rear parking lot of Robert's Lounge go north on Eleventh Street. As Groves fell in behind the car and followed it he radioed the police dispatcher he was behind the red Gremlin going north on Eleventh Street. The officer stopped the Gremlin at the 1400 block of Tenth Street at 1:41 a. m.

There were three blacks in the car, driver Gary Forrester, Gary Harvey and Miss Marva Edwards. As the three exited the car, Forrester approached the officer but Edwards and Harvey stopped at the rear of the auto, whereupon Groves observed Harvey take what appeared to be folding money from his pocket and place it in Miss Edwards' purse. As several other squad cars arrived on the scene, Groves removed 46 dollars in cash from the purse. He also observed a tow bar on the right-hand floor of the front seat.

Officer Robert Wallace had arrived and searched Forrester who was advised of his rights. Lieutenant Charles F. Backstrom searched the Gremlin, observing a tow bar on the right floorboard. It was after this an ambulance containing Mr. Barrows arrived. Barrows got out under his own power and identified Forrester who was sitting in the back seat of a squad car and Harvey who was still standing next to the lieutenant. The evidence conflicted as to whether Barrows was wearing his glasses and, likewise, as to the extent of lighting at the scene. Also in conflict was the distance Barrows was from Forrester when someone shined a flashlight on his face. Officer Wallace stated it was two or three feet, whereas Forrester testified, "he was so far away I know he couldn't see me."

In any event, another officer, Larry Smiley, informed Harvey he was suspected of armed robbery, advised him of his rights and made a body search. Smiley "felt a large, bulky substance" in Harvey's right front pocket which turned out to be a billfold (exhibit 3B) containing the name Daniel Barrows. Also discovered was a traveler's check (exhibit 3A). This property was either placed in the squad car by Smiley after he showed it to his partner, Officer Patch, or was given to Officer Patch at the scene who retained possession of it until turning it over to officers at the police station. While foundation was an issue at trial, no argument is made on appeal concerning chain of possession.

Officer Smiley also testified several items were recovered from Forrester, including

two rings (exhibit 7) and a book of matches (exhibit 6). Forrester denied having the matches in his possession that evening. It was adduced during cross-examination of Forrester the matchbook bore the words "Holiday Inn."

Harvey and Forrester gave a different story of the events of that night. Harvey testified he and Forrester played cards at a girlfriend's home from about 9:30 p. m. until they left for Robert's Lounge around 10:00 in a red Gremlin belonging to Harvey's sister. While at the tavern, Harvey loaned the car to a man named "Slick," whom he had seen a week before at Robert's Lounge. (In this regard, Officer Clarence Jobe, who had interviewed Harvey March 15, testified Harvey stated he loaned the car to someone he had never seen before). Slick returned the Gremlin at about 1:30 a. m., at which time Harvey, Forrester and Miss Edwards left the bar. Upon reaching the car, Harvey noticed a billfold on the front seat, the money from which he put in his pocket. Harvey thought the wallet belonged to Slick.

Shortly thereafter, with Forrester driving, the police stopped the car. After disembarking, Harvey gave Miss Edwards the folded bills because he "wanted her to have the money."

Forrester's testimony did not differ greatly except for the fact he knew nothing of Harvey's loan of the car. Significantly, Forrester stated he wears a dental plate because of two missing teeth. He was wearing the plate March 15, but by the time he was taken to the police station the plate was out. Forrester stated, "I take them out when I get to drinking."

Several other witnesses testified on behalf of the defense, including Harvey's sister and brother-in-law, who stated they knew a man named Slick. Furthermore, Robert Edmonds, owner of Robert's Lounge, testified Forrester was at the tavern from 10:00 p. m. until closing time around 2:00 a. m. When he turned up the lights at 1:45 a. m., Forrester was still there. Edmonds did not know if Harvey had been in the bar.

Defendant's motion for new trial was overruled and he was sentenced pursuant to section 711.2, The Code, to a term not to exceed 25 years at the Men's Reformatory in Anamosa.

I. The first contention defendant presents for review concerns the trial court's denial of a request to have certain in-chambers testimony of the prosecuting witness read to the jury. It was initially disclosed in the jury's presence Barrows had been treated earlier for a blood-calcium problem. Barrows later testified in chambers he had received psychiatric treatment for a nervous disorder after being arrested on charges of drunken driving and resisting arrest. While this treatment occurred some time before the robbery, Barrows was unable to recall the exact time, although "it might have been" as late as February of 1974 (the robbery took place in March).

*Forrester's* attorney, Mr. Glenn, requested that the questions and answers given in chambers be read to the jury because they were "material." Agreeing with the prosecutor, the trial court held this line of testimony was "irrelevant to any of the material issues." Nothing further transpired until the close of State's evidence when *Forrester's* counsel stated the testimony should be read to the jury as "it goes to the *credibility* of Mr. Barrows' testimony." The trial court reserved ruling "until such time as there is some evidence offered on the part of the defendants, and then we'll take the matter up again outside the presence of the jury at your request."

At the close of all evidence the court inquired of counsel if there were "anything further on the part of the defendants." Both defense counsel (counsel for Forrester and counsel for defendant) answered in the negative. Later, out of the jury's presence, defense counsel objected to the court's failure to allow Barrows' testimony to be read to the jury. Mr. Glenn renewed motions made at the close of State's evidence and referred to "the exclusion in testimony specifically of Mr. Barrows' psychiatric evaluation examination, whatever that was." Defendant's counsel, Mr. Laughlin, stated the

record showed he had joined in the objections made by Glenn, renewed the same and then stated:

"I would also join in and concur with Mr. Glenn in his objection and taking exception to the Court's failure to permit both the defendant, Gary Forrester, and the defendant, Gary Harvey, to get into the testimony of Mr. Barrows relative to his present physical condition and/or mental condition." The trial court overruled these motions.

Finally, in defendant's motion for a new trial, it was asserted the trial court erred in failing to allow the attorneys to cross-examine Barrows "relative to his present and past mental and physical condition and his present and past physical and mental ailments, *all of which went to his competency as a witness to testify in this matter against the defendant in question.*"

As we understand from the record of the trial proceedings and the arguments in this court defendant, relying solely on the in-chambers testimony of Barrows as an offer of proof, maintains in effect this testimony, standing alone, was relevant and admissible for consideration: (1) by the court as a basis for a ruling that Barrows' testimony should have been excluded since he lacked the qualifications necessary to be a competent witness and (2) by the jury as a basis for explaining away or diminishing the probative value of Barrows' testimony which had been previously admitted before the jury.

As indicated, in the trial court proceedings defendant urged admissibility of the in-chambers testimony as bearing on the credibility of Barrows, whereas in his motion for new trial it was asserted this testimony went to Barrows' competency as a witness to testify in the present proceedings. He fails to discriminate between the question of Barrows' competency as a witness and that of his credibility in urging reversal of the trial court's ruling excluding the in-chambers testimony. McCormick on Evidence (Second Ed.), section 45.

"The orthodox division of function between judge and jury allots, without question, to the *judge* the determination of all matters of fact on which the *admissibility of evidence* depends (*post,* § 2550), and therefore of the facts of a witness' capacity to testify." (Emphasis in original). 2 Wigmore on Evidence (Third Ed.), section 487. "But, after the Court has passed on the witness' capacity, it is still open to the jury to conclude that the witness is not credible and to reject the testimony entirely; and the Court's decision does not necessarily affect the estimate which the jury must make." *Id.,* section 497. This court announced the same principle in somewhat different words in *State v. Johnson,* 260 Iowa 1207, 1212, 152 N.W.2d 426, 429.

Consequently, due to this relationship between a witness's capacity and his credibility, it is our opinion that this is not a case for application of the rule that the grounds of a motion for new trial must stand or fall on exceptions taken at trial and a party cannot in a post verdict motion amplify or add new grounds as a basis for relief. *Dutcher v. Lewis,* 221 N.W.2d 755, 758 (Iowa 1974) and *State v. Droste,* 232 N.W.2d 483, 488 (Iowa 1975).

We consider first defendant's challenge based on the assertion Barrows was incompetent as a witness. In determining whether a witness is to be excluded because of a lack of testimonial qualification three processes are involved: First, it must be determined whether the witness has observed the incident about which he proposes to testify and has received some impressions which he seeks to relate in court; second, whether the witness has a recollection of those impressions resulting from his observation which fairly corresponds with or reproduces the original knowledge or observation; and third, whether he is able to communicate this recollection to the tribunal. In the absence of any one of these elements the witness's testimony cannot be believed. Of the three distinct sorts of incapacity which preclude the witness from testifying at the outset, the one relevant here is that described as "organic incapacity." This affects the witness's knowledge or his power of recollection, communication or all three.

*Wigmore* tells us there is a second incapacity which involves "a lack of power to judge rightly on particular subjects, and arising from lack of *experience* or training. This incapacity extends to particular topics only, not necessarily to the whole subject of litigation." (Emphasis in original). *Id.,* section 478. This type of incapacity is not involved in the present case.

Section 622.1, The Code, provides:

"*Witnesses—who competent.* Every human being of sufficient capacity to understand the obligation of an oath is a competent witness in all cases, except as otherwise declared."

■ Competency of a witness to testify under this statute or his capacity of communication has two aspects: (1) the mental capacity to understand the nature of the questions put and to form and communicate intelligent answers thereto and (2) the moral responsibility to speak the truth, which is the essence of the nature and obligation of an oath. *State v. Schweider,* 5 Wis.2d 627, 94 N.W.2d 154, 157. See also *Wigmore,* section 495.

■ In our opinion the evidence disclosed by defendant's offer of proof arising from cross-examination of Barrows would not, as a matter of law, support a trial court's determination Barrows' trustworthiness upon the specific subject of his testimony had been negatived due to a substantial impairment in his qualification to observe, to recollect or communicate.

The trial court was correct in its ruling insofar as Barrows' competency to testify was challenged.

It is noted in McCormick on Evidence (Second Ed.), section 61, page 139, that "the common law rules of incompetency have been undergoing a process of piecemeal revision by statutes for over a century, so that today most of the former grounds for excluding a witness altogether have been converted into mere grounds for impeaching his credibility."

" * * * [W]hen the judge has once determined the admissibility of a witness, by applying the rules of law to the facts found by himself, the witness stands before the jury for them to judge of his credit as they see fit, untrammelled by the rules of law as to his qualifications * * *. It would follow that if they rejected his testimony, it should be merely because, all things considered, they do not believe him, and not because they find him lacking by force of some legal definition of competency; for with such definitions the jury have nothing to do." *Wigmore,* section 487.

It is apparent the defense sought to question Barrows' credibility through demonstration of a possible defect in his capacity to observe, remember or recount matters testified to on direct examination.

This court has recognized several areas wherein a witness's credibility may be put in question. In *State v. Peterson,* 219 N.W.2d 665, 671 (Iowa 1974), it was stated:

" 'Impeachment' is the word given to denote the technique for calling into question the veracity of a witness. Fundamental evidence law recognizes five surviving lines of attack upon the credibility of a witness. The first, perhaps the most effective and certainly the most frequently employed, is to prove a witness, on a previous occasion, has made statements inconsistent with his present testimony. A second alternative is to show the witness is biased, by reason of emotional influences such as kinship for one party or a hostility to another, or motives of pecuniary interest, whether legitimate or corrupt. A third alternative is to attack the character of the witness. The fourth recognized line of attack upon a witness's credibility is to show *a defect in his capacity to observe, remember or recount the matters testified about.* The fifth, and final surviving alternative, is to prove by other witnesses that material facts are otherwise than as testified to by the witness under attack." (Emphasis supplied).

The defense tendered its offer of proof which showed Barrows was admitted to a hospital for a "nervous disorder" under the care of a psychiatrist. The reason for the treatment was due to charges against Barrows of drunken driving and resisting ar-

rest. As noted, Barrows may have been in the hospital as late as February of 1974. Significantly, this in-chambers testimony did not reveal the nature of the nervous disorder or in any way indicate in what manner Barrows' credibility might have been affected.

■ Defense counsel did not in any way adduce in their offer of proof what Barrows' problem entailed or how any treatment related to his ability to testify. Although furnished the name of Barrows' psychiatrist, his telephone number and permission to call the psychiatrist and inquire "if he thought this would have—any way it would hurt my reasoning, or, you know, talking about the past," counsel declined to pursue the matter further in their offer of proof. In other words, nothing was shown as to the effect mere admission to a hospital by reason of a "nervous disorder" would have on Barrows' powers of observation, recollection or narration. Consequently, it could be said the offer of proof itself was not sufficient to show Barrows' unreliability.

On point is the case of *Bakken v. State,* 489 P.2d 120, 124 (Alaska 1971), where an important witness's testimony in a rape prosecution was sought to be impeached. The defense, through an offer of proof, showed the witness had recently undergone a psychiatric examination after being caught running naked while drunk. The court held " * * * neither the fact of Johansen's psychiatric examination by itself nor in combination with the Point Arena [running naked] incident constituted a sufficient offer of proof as to Johansen's testimonial unreliability."

In *United States ex rel. Polhill v. Otis,* 316 F.Supp. 334, 336 (S.D.N.Y.1970), the court held neither the fact the witness " * * * underwent psychiatric examination, which fact he readily admitted at the trial, pursuant to a request by a prison psychiatrist, nor the fact that one psychiatrist thought that he ought to undergo further examination are sufficiently probative so as to be introduced to the jury. * * * [citing authority]."

In *United States v. Honneus,* 508 F.2d 566, 573 (1 Cir. 1974), cert. den., 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975), the circuit court noted:

" * * * While insanity or abnormality at the time of observing the facts testified to or at the time of testimony are provable, a 'nervous breakdown' at some unspecified time is too remote. * * * [citing authorities]. No offer of proof was made that Thurlow's condition could be shown to relate to his competency or qualifications as a witness. The court was entitled to weigh the potential unfairness of a free wheeling inquiry intended to stigmatize the witness against whatever materiality the evidence might have."

The court in *Sturdevant v. State,* 49 Wis.2d 142, 181 N.W.2d 523, 526, 44 A.L.R.3d 1196, 1201, quoting from 98 C.J.S. Witnesses § 461, pages 326–327, stated:

" 'The mental capacity of a witness is proper to be considered as bearing on his credibility. Thus the impaired condition of the mind either from a temporary cause, * * * or other infirmities, is deemed a proper subject of inquiry for the consideration of the jury in determining the credibility of a witness. So it may be shown that the witness has a mind or memory impaired from disease or other cause; *but mere mental impairment, without more, is not sufficient to affect credibility, * * * .'* " (Emphasis supplied).

This statement from *Commonwealth v. Butler,* 232 Pa.Super. 283, 331 A.2d 678, 680, is pertinent to the problem:

"The crucial determination that a trial judge must make in ruling on the admissibility of evidence of a witness's mental instability is whether it is related to the subject of the litigation or whether it affects the testimonial ability of the witness so as to impeach him. The evidence can be said to affect the credibility of a witness when it shows that his mental disorganization *in some way impaired his capacity to observe* the event at the time of its occurrence, to communicate his observations accurately and truthfully at trial, or to maintain a

clear recollection in the meantime. * * * [citing authority]." (Emphasis supplied).

As pointed out, defense counsel were given full opportunity to show the "nature and extent" of Barrows' "nervous disorder."

In light of the principles recognized in the foregoing authorities we conclude, as a matter of law, defendant's offer of proof which showed Barrows had been admitted to a hospital for a "nervous disorder" under the care of a psychiatrist was not sufficiently probative to be introduced to the jury on the issue of his credibility in the absence of any evidence tending to demonstrate such fact was related to Barrows' capacity to perceive, remember or relate the facts narrated in his testimony.

■ Harvey's argument in support of this assignment must, of necessity, be based on the premise the offer of proof, standing alone, was sufficient to challenge Barrows' credibility. Since we have determined that this offer of proof was insufficient as a matter of law, it cannot be said defendant's right of cross-examination was unduly restricted.

The trial court did not err in its ruling.

II. Defendant next argues the search and seizure which immediately *preceded* his arrest was unlawful and, therefore, that "any testimony relative to what was allegedly seized from the Defendant-Appellant should have been suppressed by the trial court."

The State counters the warrantless search was valid under either of two of the few exceptions to the requirement searches must be under warrant. First argued is the fact Officer Groves possessed "probable cause to stop the vehicle and place the appellant under arrest. The attendant search of the appellant, which *followed* the appellant's arrest, was therefore clearly justifiable." It is also contended there was probable cause to effect an investigatory stop. And *after* seeing defendant pass what appeared to be folding money to Miss Edwards, Groves had probable cause to arrest.

The second line of the State's defense concerns the contention exigent circumstances justified the warrantless search, in that defendant could well have escaped or concealed the stolen goods if Groves had delayed.

It is at the outset quite apparent defendant was "officially" arrested subsequent to the search of his person. The search, furthermore, was warrantless.

" * * * We have said '[w]hile the fourth amendment prohibits only unreasonable searches and seizures, warrantless searches and seizures are *per se* unreasonable unless they come within a few "jealously and carefully drawn" exceptions. The burden is upon those seeking to apply the exceptions to prove their applicability.' * * * [citing authorities].

"We have described the jealously and carefully drawn exceptions: 'No warrant is necessary when the search and seizure, within prescribed limits are incident to a lawful arrest; the warrant requirement may be waived by an informed and voluntary consent; and, third, existence of exigent circumstances may relieve an officer from the obligation to obtain a warrant if it is impracticable to do so.' * * * [citing authorities]." *State v. Schlenker*, 234 N.W.2d 142, 144 (Iowa 1975).

■ Defendant argues the search herein cannot fall under the first exception outlined above since, in effect, the arrest was incident to the search. However, the fact a search occurs a few minutes before arrest does not *per se* invalidate that search. In *State v. Johnson*, 232 N.W.2d 477, 479 (Iowa 1975), this court aptly stated:

"The following appears in *Skinner* [*United States v. Skinner*, 412 F.2d 98 (8 Cir. 1969)], where it was claimed a search was not incidental to an arrest because it was allegedly made several minutes before the defendant was formally taken into custody:

" 'The government contends that the police officer had probable cause to arrest the defendant and the fact that the search may have preceded the formal arrest by a few

moments is irrelevant. We believe its position is a sound one.

" ' * * *

" 'The search is valid whether it took place moments before or moments after the arresting officer took the suspect into actual custody or announced his intention of doing so. * * * '

"A similar statement may be found in *United States v. Clemons*, 503 F.2d 486, 488 (8th Cir. 1974). The standards by which a search and seizure are to be measured cannot be couched in fixed and inflexible terms. Each case must be decided on its own facts and circumstances. * * * [citing authority]."

■ In other words, if the prosecution shows probable cause to arrest existed prior to a search of a man's person, admissibility of evidence seized by reason of such search is not affected by the fact a formal arrest was not made until moments later. In support see *Sibron v. State of New York*, 392 U.S. 40, 77, 88 S.Ct. 1889, 1909, 20 L.Ed.2d 917, 943 (concurring opinion of Harlan, J.). See also *Reed v. United States*, 401 F.2d 756, 761 (8 Cir. 1968) *State v. Farrell*, 242 N.W.2d 327 (Iowa 1976).

The court in *Sibron*, 392 U.S. at 64, 88 S.Ct. at 1903, 20 L.Ed.2d at 935, declared that " * * * before [an officer] places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so."

The question at this point is whether the arrest of Harvey had, for purposes of constitutional justification, already taken place before the search of his person commenced.

■ In this connection it is necessary to repeat some of the factual background leading to the search. Officer Groves in response to a radio dispatch that an armed robbery had just been committed at the Holiday Central by two black males who had made their escape in a red Gremlin proceeded to the area of Robert's Lounge where he observed a red two-door Gremlin leaving the rear parking lot. The officer

fell in behind the car and advised the police dispatcher by radio that he was following the Gremlin north on Eleventh Street. At a point in the 1400 block of Tenth Street the officer signalled the Gremlin to stop by activating the white light on the police vehicle.

Forrester was the first out of the car. He came back toward the officer and said something to the effect, "What's going on," or "What's the matter?" Defendant Harvey was getting out of the passenger side of the car about the same time. As soon as they moved to the rear of the Gremlin they were directed by the officer to stand by the patrol car and put their hands on it. The command was reinforced with the display of a gun in the hands of the officer. All of this occurred before the search of Harvey. Harvey's freedom of movement had been curtailed on the basis of probable cause to believe that he had been engaged in criminal activity.

In our opinion the evidence disclosed in the case before us conclusively demonstrates that Harvey's liberty of movement had been effectively restricted by the police officer. "An arrest to be effective does not require formal words of arrest or stationhouse bookkeeping." *United States v. Hensley*, 374 F.2d 341, 348 (6 Cir. 1967), cert. den., 388 U.S. 923, 87 S.Ct. 2139, 18 L.Ed.2d 1373. His arrest had been consummated before the search of his person and it was not altered in point of time by anything which was thereafter had or done. See *Reed v. United States*, 401 F.2d at 761.

The question now turns to the problem whether probable cause existed for the arrest.

In *State v. King*, 191 N.W.2d 650, 653 (Iowa 1974), this court in dealing with the meaning of probable cause quoted an often cited passage from *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327, 332:

" 'In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they

are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' * * * [citing authority]. Probable cause exists where 'the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' and offense has been or is being committed. * * * [citing authorities]." The foregoing quotation is repeated in *State v. Morris*, 227 N.W.2d 150, 152 (Iowa 1975).

Although "probable cause implies that the information which has come either directly or indirectly to the arresting officers' knowledge must rise above the mere suspicion of criminal activity, it at the same time need not be tantamount to that quantum of proof which would sustain a conviction of guilt." *Clay v. United States*, 394 F.2d 281, 285 (8 Cir. 1968).

■ Whether probable cause exists to make an arrest turns upon the facts of the particular case. However, in our opinion, the following decisions are pertinent to a determination of the problem here.

The court in *United States v. Trotter*, 433 F.2d 113, 115 (7 Cir. 1970), cert. den., 401 U.S. 942, 91 S.Ct. 950, 28 L.Ed.2d 224, stated:

" * * * The officers testified that they were looking for two white males with a lady in a clearly described distinctive vehicle. In *Chambers v. Maroney*, 1970, 399 U.S. 42, 46, 90 S.Ct. 1975, 26 L.Ed.2d 419, two witnesses described a blue compact station wagon bearing four men, one in a green sweater, seen speeding away from a parking lot close to a gas station which they then learned had been robbed. The victim described two robbers wearing respectively a green sweater and a trench coat. The data was broadcast and was held sufficient to justify arrest of the occupants of such a vehicle, one of whom wore a green sweater. The vehicle here was much more distinctively described. In *Coleman v. United States*, D.C.Cir., 1969, 420 F.2d 616, 619, 621 [137 U.S.App.D.C. 48], a broadcast message was held to be sufficient which described a vehicle as a U-Haul truck shaped like a Volkswagen bus and the possible occupants as four Negro males, one dark skinned, of heavy build with a large bushy mustache. See also *Lewis v. United States*, 1969, 135 U.S.App.D.C. 187, 417 F.2d 755 where a description of four Negro males in a green car seen leaving the site of a robbery was held sufficient to justify arrest of the four men walking away from such a car."

In *United States v. Maryland*, 479 F.2d 566, 569 (5 Cir. 1973), a liquor store owner, upon whom had been passed counterfeit money, told the investigating officer the perpetrators were four blacks, two men and two women, who were traveling in a "black and white vinyl over green Cadillac." This description was broadcast over police radio. The circuit court thought " * * * the information given to law enforcement authorities by the victim of the crime immediately after its occurrence was clearly sufficient to supply probable cause for appellant's arrest. * * * [citing authority]."

This statement in *Pendergrast v. United States*, 135 U.S.App.D.C. 20, 416 F.2d 776, 783 (1969), although lengthy, is apposite to a determination of the present question:

"Probable cause for a warrantless arrest is the constitutional criterion by which its legality is measured. And ' "[t]he substance of all the definitions" of probable cause "is a reasonable ground for belief of guilt." ' Thus, '[w]hen the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would "warrant a man of reasonable caution in the belief" that an offense has been committed' by the arrestee.

"This essential determination, however, is not of the actuality of guilt, but rather of its likelihood. The factual predicates for a finding of probable cause need not approach that moral certainty of guilt upon which a conviction after trial must rest, but are

sufficient though only appearances that a reasonable mind could accept as grounds for believing in guilt. 'In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.'

"So it is that a showing of probable cause involves considerably less than the demonstration of guilt demands. The indicia of guilt need not be absolute, or even fully consistent; they may leave some room for doubt, and even for error. But they suffice, we repeat, when they 'warrant a man of reasonable caution in the belief' of guilt." (Footnotes omitted).

In this connection see *United States ex rel. Dessus v. Commonwealth of Pa.*, 452 F.2d 557, 561–562 (3 Cir. 1971), cert. den., 409 U.S. 853, 93 S.Ct. 184, 34 L.Ed.2d 96 (1972), and *Keeny v. Swenson*, 458 F.2d 680, 683 (8 Cir. 1972), cert. den., 409 U.S. 1027, 93 S.Ct. 468, 34 L.Ed.2d 321, rehearing den., 409 U.S. 1118, 93 S.Ct. 915, 34 L.Ed.2d 703.

Section 755.4, The Code, provides in part:

"*Arrests by peace officers.* A peace officer may make an arrest * * * without a warrant:

" * * *

"2. Where a public offense has in fact been committed, and he has reasonable ground for believing that the person to be arrested has committed it."

" * * * [W]hen, as here, issues as to violation of constitutional safeguards are raised this court is obliged to make an independent evaluation of the totality of the relevant circumstances shown by the entire record under which rulings on those constitutional rights were made. That is, when a constitutional issue is presented, the evidence relevant to the issue is reviewed de novo. * * * [citing authorities]." *Rinehart v. State*, 234 N.W.2d 649, 658 (Iowa 1975).

After review and evaluation of the totality of the relevant circumstances in light of the principles recognized in this opinion, we conclude that on the basis of the facts and circumstances known to the police officers involved, or as to which they had reasonably trustworthy information stemming from the police broadcast, probable cause existed for Harvey's arrest.

Because the warrantless arrest of Harvey was valid the police officers were justified in searching him incident thereto. Defendant's contention in the respects considered in this division is without merit.

III. Defendant argues the verdict was clearly against the weight of the evidence.

On defendant's appeal from criminal conviction based on jury verdict challenging sufficiency of evidence to sustain the verdict, the evidence is viewed in the light most favorable to the State and we accept as established all reasonable inferences tending to support the jury's action. It is necessary to consider only the supporting evidence whether contradicted or not.

It is the task of the fact finder to resolve questions of fact and assess the credibility of witnesses. And a finding of guilt is binding on this court unless without substantial support in the record. *State v. McCullough*, 226 N.W.2d 216, 217 (Iowa 1975).

There is no merit in this contention.

The case is

Affirmed.