STATE of Iowa, Appellee,

v.

Steven Wayne RAINS, Appellant.

No. 97–638.

Supreme Court of Iowa.

Feb. 18, 1998.

Gerald J. Kucera of Tom Riley Law Firm, P.C., Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, Robert P. Ewald, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Kasey Wadding, Assistant County Attorney, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, NEUMAN, and SNELL, JJ.

SNELL, Justice.

Defendant appeals his convictions for various charges arising out of a traffic stop. Because we find no error in the district court's rulings, we affirm.

## I. Background Facts and Proceedings

Based upon the evidence presented at trial, a jury could have found the following facts. At approximately 2:15 a.m. on July 14, 1996, Waterloo police officers Andrew Clark and Cory Allspach were on patrol when they noticed a car weaving in its own lane and on several occasions nearly striking the center median strip. The officers followed the car until it turned into a parking lot, where they observed the driver exit the vehicle. The officers entered the lot from another direction and parked the patrol car approximately ten feet away from the suspect vehicle. As the officers pulled to a stop, they noticed the driver had re-entered his vehicle and shut the car door.

Officer Clark suspected the driver had been drinking. He exited his patrol car to determine whether the driver was intoxicated and to investigate his reason for being in the deserted parking lot at that time of the morning. When Officer Clark approached the vehicle, he asked the driver, Steven Rains, whether he was experiencing any problems. Rains responded that he was having car problems, although Officer Clark observed that the vehicle's engine was running smoothly. Clark noticed Rains' speech was slurred and he could detect an odor of alcohol emanating from either Rains or the vehicle. Clark asked Rains how much he had to drink that evening to which he responded he'd had "a couple." Clark then asked Rains for his driver's license. Rains stated that he did not have a license and Clark requested some other form of identification. Rains initially questioned Clark's right to see the identification, but subsequently acquiesced and told Clark he would produce identification.

Rains turned his body toward the passenger seat in what Clark thought was an attempt to retrieve his identification. When Rains turned back to face Clark, Rains stated he was going to pull the car forward. Clark told Rains to leave the car where it was. Clark then noticed the vehicle starting to move slightly forward. Clark assumed that Rains was either intoxicated and unable to control the vehicle or that he did not understand his command to leave the vehicle in the same position. At that point, Clark reached in through the driver's open window and placed his right hand on Rains' left shoulder and his left hand on Rains' right forearm. He also reiterated his command to stop the vehicle.

The car then began to move more quickly and Clark felt himself being carried along with the car. Clark tried to run alongside the car, but it was accelerating too quickly and he was being dragged. During this time, Clark continued to command Rains to stop the vehicle. Officer Allspach yelled at Clark to let go, but the vehicle was going too quickly at that point and Clark feared being run over by the rear wheels of the car if he dropped to the ground. Clark then pulled his upper body through the driver's window

to avoid being dragged. Rains directed the car toward an alley leading to an adjoining street. As the car moved down the alley, Clark could feel it jerking back and forth as if Rains was attempting to dislodge him from the car. As the vehicle turned onto the street, Clark feared that Rains would attempt to strike a building or other object in an attempt to "scrape" him off the vehicle. Clark then grabbed Rains by the throat with his left hand in an attempt to force him to stop. This tactic was ineffective and Clark believed the only way he could stop the vehicle was to utilize his firearm. Clark tightened his grip with his left hand, grabbed his gun with his right hand, placed it against Rains' left side and fired. The gun subsequently jammed and Clark realized he would be unable to fire a second shot. Hoping that Rains would not realize the gun was jammed, Clark held the gun to Rains' head and again commanded him to stop. Rains then stopped the vehicle. Officer Allspach arrived on the scene and an ambulance was called for Rains. Rains was transported by ambulance to a local hospital for treatment of the gunshot wound.

While at the hospital, medical personnel (at the request of the attending physician) drew samples of Rains' blood for diagnostic and treatment purposes. There was no written request for blood samples by either the police or county sheriff's department under the Iowa Code's implied consent provisions. *See* Iowa Code § 321J.6 (1995). Approximately one month after the incident, pursuant to a search warrant, the Black Hawk County sheriff's office obtained two tubes of blood drawn by the hospital. Tests were run on those samples by the Department of Criminal Investigation in Des Moines. The results showed a blood alcohol concentration of .168 mg/dl, which is above the statutory limit for legal intoxication of .10 mg/dl established by Iowa Code section 321J.2(1)(b). Rains remained hospitalized for twenty-eight days. During the first three days of that time period, an armed police officer was posted in the hallway outside Rains' hospital room. The guard was removed after complaints by Rains' family.

On October 7, 1996, Rains was arrested and a trial information was filed charging Rains with five counts: (1) assault on a peace officer with intent to inflict a serious injury, in violation of Iowa Code section 708.3A(1) (Supp.1995); (2) interference with official acts with intent to inflict serious injury, in violation of Iowa Code section 719.1(1); (3) operating a motor vehicle while intoxicated, second offense, in violation of Iowa Code section 321J.2(2)(b); (4) operating a motor vehicle while license revoked in violation of Iowa Code section 321J.21; and (5) operating a motor vehicle while license suspended in violation of section 321A.32(1). Rains pleaded not guilty to the charges.

Rains filed a motion to suppress the results of the blood tests on December 20, 1996. He filed a motion to dismiss for violation of the speedy indictment rule on January 9, 1997. The district court denied both motions and the case proceeded to trial. The jury found Rains guilty on all counts. The district court sentenced Rains to serve concurrent terms of imprisonment not to exceed five years on his convictions for assault on a peace officer and interference with official acts. The court also sentenced Rains to two years on the OWI conviction and concurrent one-year terms for operating while license suspended and revoked. The two-year sentence was ordered to run consecutively to the five-year sentence for a total of seven years. Rains appealed.

## II. Issues

On appeal, Rains argues the district court committed four errors. First, he maintains the district court erred in overruling his motion to dismiss based on an alleged violation of the speedy indictment rule. He argues that he was effectively arrested on July 14 when Officer Clark attempted to restrain him by shooting him. He maintains the restraint continued by the posting of an armed officer outside his hospital room. Therefore, Rains contends, because the State did not file charges until October 7, it violated the forty-five day time limit for indicting arrestees established by Iowa Rule of Criminal Procedure 27(2)(a). Second, Rains argues the district court erred in failing to sustain his

motion to suppress the results of the blood tests. He argues that Iowa's implied consent law was not followed and therefore the results should be suppressed. Third, Rains contends the district court erred in refusing to submit his requested jury instructions regarding the defense of justification. Fourth, Rains alleges the district court erred in declining to admit the testimony of Frank Saunders, an expert in police procedure who would have testified that Officer Clark did not act properly in investigating Rains' actions on the night of July 14 and that Clark used excessive force in his attempt to restrain Rains.

### III. Speedy Indictment Violation

#### A. Preservation of Error

■ The State contends that Rains failed to preserve error on this issue because he did not file a motion to dismiss within forty days of his arraignment. Rains was arraigned on October 29, 1996. The motion to dismiss on speedy indictment grounds was not filed until January 9, 1997, past the forty day time limit. Iowa Rules of Criminal Procedure 10(2)(b) and 10(4) require that motions to dismiss based on defects in the indictment must be filed within forty days of arraignment. Rule 10(3) provides that failure by the defendant to timely raise such a motion shall constitute waiver of the issue. However, the court can grant relief from such a waiver for good cause shown.

Rains argues that he obtained an extension of time to file pretrial motions which constitutes good cause under rule 10(3). He also contends that the State failed to object to his motion to dismiss on timeliness grounds and that it has therefore waived this issue.

Rains' counsel filed a motion for an extension of time to file pretrial motions on November 20, 1996, citing the large number of persons the State listed as possible witnesses and arguing that the bases for possible pretrial motions could not be known until discovery was completed. The court granted Rains' motion on November 22, 1996, ordering a deadline of January 24, 1997, for the filing of all pretrial motions.

■ Our scope of review of the district court's decision on this issue is for an abuse of discretion. *See State v. Christensen*, 323 N.W.2d 219, 222 (Iowa 1982) (employing abuse of discretion standard in determining whether good cause existed for untimely notice of alibi defense); *State v. See*, 532 N.W.2d 166, 168 (Iowa App.1995) (utilizing abuse of discretion standard in reviewing whether good cause existed for defendant's untimely motion to suppress). We will not find an abuse of discretion unless it is shown that such discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable. *Christensen*, 323 N.W.2d at 222.

The district court obviously concluded that defendant and his counsel had shown good cause to warrant an extension of the forty day time limit found in rule 10. We find no abuse of discretion in this decision. Thus, we consider on the merits the defendant's contention that the district court erred in overruling his motion to dismiss for an alleged violation of the speedy indictment rule.

#### B. The Merits

##### 1. Iowa Law on Arrest

■ When interpreting Iowa Rule of Criminal Procedure 27(2)(a), the speedy indictment rule, we review for correction of errors at law. Iowa R.App. P. 4; *State v. Dennison*, 571 N.W.2d 492, 494 (Iowa 1997); *State v. Davis*, 525 N.W.2d 837, 838 (Iowa 1994).

■ Rule 27(2) states as follows:

2. Speedy Trial. It is the public policy of the state of Iowa that criminal prosecutions be concluded at the earliest possible time consistent with a fair trial to both parties. Applications for dismissals under this subsection may be made by the prosecuting attorney or the defendant or by the court on its own motion.

a. When an adult is arrested for the commission of a public offense ... and an indictment is not found against him within forty-five days, the court must order the prosecution to be dismissed, unless good cause to the contrary is shown or the defendant waives his right thereto.

The term "indictment" as used in rule 27(2)(a) includes a trial information. Iowa R.Crim. P. 5(5); *State v. Schuessler*, 561 N.W.2d 40, 41 (Iowa 1997); *Davis*, 525 N.W.2d at 839.

In this case, eighty-five days passed between the incident on July 14 and the filing of the trial information on October 7, 1996. Rains argues that his arrest occurred on July 14, the date of the incident, and that therefore the rule has been violated. The State does not contend that good cause has been shown in this instance. Furthermore, we concluded above that defendant did not waive his right to a speedy indictment by not filing his motion to dismiss on that ground until January 9, 1997. Rather, the State contends that Rains was not "arrested" for purposes of the speedy indictment rule until October 7, the day the State formally charged him by filing the trial information.

We must determine whether Rains was "arrested" for purposes of the speedy indictment rule based on the conduct of Officer Clark the night of the incident and the presence of the police officer outside Rains' hospital room for several days. The definition of "arrest" for purposes of rule 27(2)(a) is governed by the general law of arrest provided in Iowa Code chapter 804, specifically sections 804.5 and 804.14. *State v. Johnson–Hugi*, 484 N.W.2d 599, 600 (Iowa 1992). Because rule 27(2)(a) and sections 804.5 and 804.14 were enacted together, we must construe them together. *See State v. Schmitt*, 290 N.W.2d 24, 26 (Iowa 1980). Iowa Code section 804.5 defines arrest as "the taking of a person into custody when and in the manner authorized by law, including restraint of the person or the person's submission to custody." Iowa Code section 804.14 defines the manner of making an arrest:

> The person making the arrest must inform the person to be arrested of the intention to arrest the person, the reason for arrest, and that the person making the arrest is a peace officer, if such be the case, and require the person being arrested to submit to the person's custody. . . .

Prior cases are also helpful in construing the term "arrest." It has been held that mere submission to authority does not constitute an arrest. *See State v. Delockroy*, 559 N.W.2d 43, 45 (Iowa App.1996); *State v. Ransom*, 309 N.W.2d 156, 159 (Iowa App. 1981). Furthermore, an arrest does not necessarily occur simply because a reasonable person in the same or similar circumstances would believe he or she was not free to leave. *Johnson–Hugi*, 484 N.W.2d at 601 (citing *California v. Hodari D.*, 499 U.S. 621, 627–28, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690, 698 (1991)). An arrest requires "an assertion of authority and *purpose to arrest* followed by submission of the arrestee." *Id.* (quoting *Hodari D.*, 499 U.S. at 626, 111 S.Ct. at 1551, 113 L.Ed.2d at 698 (quoting Rollin M. Perkins, *The Law of Arrest*, 25 Iowa L.Rev. 201, 206 (1940))) (emphasis added). Although the use of formal words of arrest is not required to effectuate an arrest, *see State v. Harvey*, 242 N.W.2d 330, 339 (Iowa 1976), it is a factor to consider. *See* Iowa Code § 804.14; *Johnson–Hugi*, 484 N.W.2d at 600. The lack of booking or charges being filed does not necessarily mandate a finding of no arrest. *Schmitt*, 290 N.W.2d at 26. We note our recent statement regarding the effect of our prior pronouncements on the factors constituting an arrest:

> What can be gleaned from these cases is that the question of whether a defendant was "arrested" is determined on a case-by-case basis. There is no bright-line rule or test. These basic principles assist us, but are not determinative.

*Dennison*, 571 N.W.2d at 495.

## 2. Discussion

There is no evidence of explicit statements regarding arrest made by either Officer Clark the night of the incident or the officers who occupied the hallway outside Rains' hospital room for several days. Therefore, we must consider the other surrounding circumstances to determine whether Rains was arrested on July 14 or during the time officers were present outside his hospital room. *Delockroy*, 559 N.W.2d at 46. In making this consideration, we look to determine whether the facts reveal an assertion of authority and purpose to arrest, along with submission of

the arrestee. *Johnson–Hugi*, 484 N.W.2d at 601.

We conclude that Rains was not arrested during his encounter with Officers Clark and Allspach on July 14, 1996. The officers followed Rains into the parking lot for investigative purposes only, to ascertain whether he had been drinking and to determine his reason for being in the deserted parking lot so late at night. As we have cautioned before, "[a]n arrest of a citizen is a serious matter. It should not be done unless the peace officer or the state has probable cause to do so." *Davis*, 525 N.W.2d at 840. At the time Officer Clark first placed his hands on Rains, in order to reiterate his command to leave the car in the same position, he was still gathering facts before deciding whether to make an arrest. All that had taken place prior to that point was an inquiry as to whether Rains had been drinking and a request for identification. More information was needed for Clark to make the decision to place Rains under arrest.

When the encounter quickly escalated, Clark feared for his safety. His actions at that point were taken in self-defense. Simply dropping to the pavement was not an option because he might have been run over by the rear wheels. Clark tried increasingly forceful measures to encourage Rains to stop the vehicle. He verbally commanded Rains to stop many times, attempted to choke him, and ultimately, when no other options remained available to him, used his firearm to force Rains to stop the vehicle. The arguable purpose of Officer Clark's actions that night was not to arrest the defendant, but to save himself from death or serious injury. Although Rains ultimately did submit to Clark's authority, without evidence of a purpose to arrest, we cannot find that an arrest occurred that night. *Johnson–Hugi*, 484 N.W.2d at 601. Moreover, any indicia of arrest that were present that evening, such as the use of force to subdue Rains, were the result of Rains' own actions. We will not allow the defendant to manipulate a factual scenario which he was responsible for creating to effect a dismissal under the speedy indictment rule.

The facts in the present case are distinguishable from the case relied on by the defendant, *State v. Delockroy*. In *Delockroy*, officers removed the defendant from her house late at night in handcuffs, transported her to the sheriff's office, *Mirandized* her, and placed her in a room alone for a long period of time. Furthermore, the defendant knew officers had found drugs in her home and that she was facing drug charges. *Delockroy*, 559 N.W.2d at 46. Our court of appeals found these factors established sufficient indicia of arrest, specifically noting that it believed the officers acted with a purpose to arrest. *Id.* However, we are unable to reach a similar conclusion in the case at bar.

Similarly, we also conclude Rains was not arrested by the presence of an armed officer outside his hospital room. Although there is no testimony as to the purpose of placing an officer outside Rains' room, we do note from the record that the officer did not prohibit family members from coming or going, showed no signs of force, and made no verbal indication that Rains was under arrest. Furthermore, the armed officer was removed upon the request of Rains' family, indicating there was no purpose to arrest.

We have never before dealt with the issue of whether the presence of an armed officer outside a defendant's hospital room constitutes arrest, but other jurisdictions have considered similar issues. In *State v. Hoskins*, 292 Minn. 111, 193 N.W.2d 802, 814 (1972), the Minnesota Supreme Court held that the presence of a deputy sheriff outside the defendant's hospital room did not compel a finding that the defendant was in custody with regard to the necessity of a *Miranda* warning. In *People v. MacCallum*, 925 P.2d 758, 765 (Colo.1996) (en banc), the Colorado Supreme Court concluded that the posting of police officers outside the defendant's hospital room for several days prior to his release did not constitute an arrest.

Given only the officer's presence outside the defendant's hospital room, we conclude that there was no purpose to arrest the defendant by this action. Therefore, we conclude the defendant was not under arrest

during the three days the officer was present.

Because we conclude that the defendant was not under arrest either at the time of the incident on July 14 or in the ensuing days at the hospital, we conclude that the indictment of defendant was timely under Iowa Rule of Criminal Procedure 27(2)(a). The trial information was filed the same day the defendant was arrested, obviously within the forty-five day time period allowed under rule 27(2)(a).

## IV. Blood Alcohol Concentration Evidence

Rains contends the district court erred in denying his motion to suppress the results of blood tests showing his blood alcohol concentration to be above the legal limit established for intoxication. *See* Iowa Code § 321J.2(1)(b). He argues that the State did not follow the procedures mandated by Iowa's implied consent law in obtaining the blood samples and that, therefore, the results of the tests should be suppressed. The State counters that because it did not request the hospital or any of its personnel to take the blood samples, it was not required to follow the procedures provided in our implied consent statute. The State contends its use of a general search warrant under chapter 808 to obtain the samples was valid and that the district court did not err in overruling Rains' motion to dismiss.

■■■ "Ordinarily, we review the district court's decision to admit evidence for an abuse of discretion." *State v. Kjos*, 524 N.W.2d 195, 196 (Iowa 1994) (citing *State v. Howard*, 509 N.W.2d 764, 768 (Iowa 1993)). To the extent admission of certain evidence turns on the interpretation of a statute, however, our review is for errors of law. *Id.* (citing *State v. Jones*, 490 N.W.2d 787, 789 (Iowa 1992)). Here, Rains based his objection to admission of the blood test results on chapter 321J. Therefore, we review the trial court's ruling to determine whether it was based on an erroneous interpretation of that statute. Our review of any alleged constitutional violations is de novo. *State v. Stanford*, 474 N.W.2d 573, 575 (Iowa 1991).

■■ Iowa's implied consent statute is codified in chapter 321J. "[T]he statute establishes the basic principle that a driver impliedly agrees to submit to a test in return for the privilege of using the public highways." *State v. Hitchens*, 294 N.W.2d 686, 687 (Iowa 1980); Iowa Code § 321J.6. If the driver withdraws that consent by refusing an appropriate request to submit to a test by a peace officer, the state has the power to revoke the operating license of the driver. Iowa Code § 321J.9(1). There are exceptions found in chapter 321J under which chemical tests can be administered in spite of a person's refusal to submit to testing or in the face of an inability of officers to obtain consent for a test. Under section 321J.10(1), a person who officers have reasonable grounds to believe was operating while intoxicated and who was involved in an accident resulting in death or personal injury likely to cause death can be subjected to chemical testing. Section 321J.7 provides for testing when the person to be tested is incapable of giving consent. In that situation the person is deemed not to have withdrawn the implied consent to test. Testing may proceed upon certification by a licensed physician that the person is incapable of consent or refusal.

The parties stipulated for purposes of the motion to suppress that there was no certification by a licensed physician that Rains was incapable of consent pursuant to section 321J.7. The parties also stipulated that Rains had not been charged with involuntary manslaughter, or homicide or serious injury by a vehicle which would have enabled admission of the results under section 321J.10(1). Therefore, the test results are not admissible under either exception discussed above. In addition, the parties stipulated that the samples obtained by the State were drawn by the hospital for treatment purposes, not for purposes of the search warrant.

■■ Although we have considered many issues involving chapter 321J, we have never addressed the precise issue set before us in this matter. We are asked to determine whether the State can properly utilize a warrant issued under chapter 808, our general statute governing the issuance of warrants, to obtain samples of blood withdrawn for

treatment purposes by a hospital. We have previously held that our implied consent statute prohibits the taking of a blood sample pursuant to a warrant after a driver has refused police requests to submit to testing. *Hitchens*, 294 N.W.2d at 687. Our holding in *Hitchens*, however, was premised on the fact that the driver had refused consent and that the State directed hospital personnel to obtain the appropriate blood samples to facilitate testing. Here, hospital personnel testified that Rains' blood was drawn in order for the hospital to conduct its own blood alcohol concentration tests and other diagnostic tests in conjunction with Rains' treatment. It was only after the hospital withdrew the blood samples from Rains that the State produced a warrant to obtain a portion of the samples for its own testing.

The defendant relies on a footnote in *State v. Stanford* to support his position that a general search warrant cannot be used in place of the implied consent procedures outlined in chapter 321J. The footnote provides in pertinent part:

> A person who refuses to submit a requested specimen, prior to arrest, and who does not come under the purview of Iowa Code sections 321J.7( dead or unconscious) and 321J.10 (person involved in accident resulting in death or personal injury likely to cause death) is not amenable to a warrant directing *production* of a specimen but rather is subject to the administrative penalty of suspension of license or driving privileges.

*Stanford*, 474 N.W.2d at 575 n.1 (emphasis added).

Rains' reliance on our footnote in *Stanford* is misplaced. He takes this language to mean that once a specimen is produced it cannot be obtained from the holder of that specimen, whether it be a hospital, laboratory or the defendant himself. However, the more accurate meaning to be drawn from this language is that a person cannot be required to submit a blood, urine or breath specimen via a warrant except in strictly circumscribed situations such as under section 321J.10. This interpretation of the language in question is in accord with our implied consent statute. *See* Iowa Code

§ 321J.9 (providing that refusal to submit to testing requires revocation of license and not providing for forced production of a sample). The warrant in question here did not request production of a specimen by Rains; rather, it requested production by the hospital of a specimen already obtained from Rains. Therefore, our footnote in *Stanford* does not support defendant's argument.

The defendant also cites *State v. Green*, 470 N.W.2d 15, 18–19 (Iowa 1991), for the proposition that there must be strict compliance with the requirements of section 321J.7 before blood tests are allowed at the direction of the State when the driver is incapable of consent. While we find no reason to disagree with this pronouncement from *Green*, we find it to be inapplicable here. The State made no attempt to comply with section 321J.7 because it did not request the hospital to draw the samples. The samples drawn from Rains were taken at the direction of medical personnel, for diagnostic and treatment purposes. The State obtained the blood samples via an alternative route, a warrant issued under chapter 808.

In *State v. Oakley*, 469 N.W.2d 681 (Iowa 1991), we considered the admissibility of blood alcohol concentration (BAC) test results obtained from a blood sample authorized by the defendant which he intended to submit for independent analysis. Oakley refused to submit to a BAC test at the request of an officer, but authorized withdrawal of blood for purposes of independent testing. The sheriff retained the sample without having it analyzed. Three months after his arrest, Oakley requested return of the blood sample. The county attorney then obtained a search warrant, seized the sample and had it tested. The results showed a BAC of more than twice the legal limit. Oakley moved to suppress the blood test evidence. We granted discretionary review of a trial court ruling sustaining Oakley's motion. *Oakley*, 469 N.W.2d at 682. Oakley argued on appeal that because the State did not follow the procedures set forth in Iowa Code section 321J.10, it was barred from using the results of the test. *Id.*

We held that "[t]he provision for a search warrant in section 321J.10 does not limit the

State's authority to obtain a search warrant under the general search warrant provisions of Iowa Code chapter 808." *Id.* at 682–83. We further noted that "section 321J.10(2) expressly provides that search warrants may be obtained either under the limited circumstances of section 321J.10(3) or in accordance with chapter 808." *Id.* at 683. We concluded that the legislature "did not intend for chapter 321J to preempt chapter 808." *Id.* Courts in several other jurisdictions which have considered this issue have concluded that implied consent statutes do not control the admissibility of blood alcohol evidence taken by a physician for medical purposes when the defendant was not under arrest. *See Nelson v. State,* 650 P.2d 426, 427 (Alaska.Ct.App.1982); *State v. Pitchford,* 10 Kan. App.2d 293, 697 P.2d 896, 898 (1985); *State v. Waring,* 779 S.W.2d 736, 740–41 (Mo.Ct.App. 1989); *Commonwealth v. Hipp,* 380 Pa.Super. 345, 551 A.2d 1086, 1093 (1988); *State v. Vandergrift,* 535 N.W.2d 428, 430 (S.D.1995); *State v. Smith,* 84 Wash.App. 813, 929 P.2d 1191, 1194 (1997).

 Rains argues that our decision in *Oakley* is inapplicable based on factual distinctions between the two cases, specifically because Oakley voluntarily submitted to a blood test and left the sample with the sheriff for independent testing, thereby destroying any expectation of privacy he might have had. Rains contends that he does have an expectation of privacy in the blood samples at issue here. However, we find that despite the fact that Rains did not consent to the drawing of his blood by hospital personnel, his lack of consent is immaterial to the seizure of the sample by warrant in this instance. Extraction of blood without a person's consent constitutes an unreasonable search only when done at government direction. *See, e.g., Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908, 917 (1966); *Turner v. State,* 258 Ark. 425, 527 S.W.2d 580, 587 (1975) (concluding that because the doctor who withdrew a blood sample from the defendant "did not act at the direction of, or by prearrangement with, any police officer, the taking of the sample did not constitute an unreasonable search and seizure"); *Commonwealth v. Russo,* 30 Mass.App.Ct. 923, 567 N.E.2d

1255, 1258 (1991) (finding that drawing of blood by medical personnel in connection with defendant's treatment "did not implicate the protection against unreasonable search and seizure of the Fourth Amendment"). Here, the blood was drawn at the direction of hospital personnel for treatment and diagnostic purposes only, so Rains' expectation of privacy argument under the Fourth Amendment is unavailing.

 In his brief before this court, Rains argues that the physician-patient privilege established by Iowa Code section 622.10 provides him with an expectation of privacy and sufficiently distinguishes his case from our decision in *Oakley.* We have previously decided that the results of blood tests taken by a physician for treatment purposes are inadmissible under the physician-patient privilege. *State v. Henneberry,* 558 N.W.2d 708, 711 (Iowa 1997). We do not decide whether the physician-patient privilege is a distinguishing factor in this situation, nor whether the privilege would be applicable to the *untested* blood samples seized by the State. We decline to decide these matters because the defendant failed to preserve error on the issue of physician-patient privilege. Rains did not raise the issue in his motion to suppress the blood test results, the matter was not litigated at trial, and the issue is only mentioned tangentially in his brief before this court. It is elementary that we do not consider issues not presented to or decided by the district court. *State v. Gogg,* 561 N.W.2d 360, 368 (Iowa 1997) (citing *State v. Halliburton,* 539 N.W.2d 339, 342 (Iowa 1995)). During the proceedings before the district court, defendant relied only on the argument that chapter 321J, our implied consent statute, preempts chapter 808's provisions for general search warrants. The defendant did not preserve error on the applicability of the physician-patient privilege and we therefore refuse to consider that issue.

We affirm the decision of the district court to overrule Rains' motion to suppress and to admit the results of the BAC tests as evidence.

## V. Jury Instructions

■ Rains argues the district court erred by refusing to submit his requested jury instructions on the defense of justification on the ground of self-defense to counter the charge of assault. We review alleged error regarding the submission of or refusal to submit jury instructions for correction of errors at law. Iowa R.App. P. 4; *State v. Simpson*, 528 N.W.2d 627, 630 (Iowa 1995).

■ The defense of self-defense is codified in Iowa Code section 704.3, which provides: "A person is justified in the use of reasonable force when the person *reasonably believes* that such force is necessary to defend oneself or another from any *imminent use of unlawful force*." (Emphasis added.) Substantial evidence of self-defense from any source justifies submission of a self-defense instruction. *State v. Dunson*, 433 N.W.2d 676, 677 (Iowa 1988). If substantial evidence exists, the district court has a duty to give the requested instruction. *Id.*

We have previously considered the issue of whether a self-defense instruction should have been submitted to the jury in assault cases. *See, e.g., State v. Delay*, 320 N.W.2d 831, 835 (Iowa 1982) (holding no evidence existed in the record to generate a jury question on the justification of self-defense and that the district court properly refused to instruct on that issue); *State v. Sharkey*, 311 N.W.2d 68, 73 (Iowa 1981) (finding that "theory of self defense was unsupported by substantial proof, and the trial court was correct in refusing to instruct the jury on the issue of justification"). The defendant cites *State v. Dunson* in support of his contention that he put forth sufficient evidence to require the district court to submit the proffered self-defense instructions. The defendant argues *Dunson* is applicable because in that case, even though the defendant was the instigator of the fight, the other party responded with grossly disproportionate force which justified the submission of a self-defense instruction. *Dunson*, 433 N.W.2d at 678. The circumstances of the present case, however, are hardly comparable to the facts in *Dunson*. In *Dunson*, the defendant struck his girlfriend with a belt. She responded by brandishing a glass vase and swinging it at the defendant. *Id.* at 677. We find the facts in this case distinguishable. Clark's placing of his hands on Rains' shoulder and forearm to signify he wanted him to stop in response to Rains' action of moving the vehicle is hardly comparable to wielding a glass vase, which could be used to inflict serious injury. Therefore, we find *Dunson* distinguishable on its facts.

We conclude that the record in this case does not contain substantial evidence to support the submission of the requested self-defense instructions in two respects. First, there is no evidence that defendant had a "reasonable belief" that force was necessary to defend himself. When Rains accelerated and began to drive the car erratically with Officer Clark hanging on, there is no evidence that supports Rains' belief that he needed to act to defend himself. Prior to the time Rains placed the car in motion, there was no evidence that Officer Clark was acting in an aggressive manner. Clark had simply approached the vehicle and asked Rains several questions. It was only when the car began to move that Clark reached inside the vehicle and placed his arms on Rains in an attempt to stress his verbal command for Rains to halt the vehicle. Clark testified that he believed Rains was having difficulty controlling the vehicle because of his intoxication or that for some reason Rains could not understand Clark's verbal commands. Clark only used subsequent measures of force in an attempt to defend himself from Rains' actions. Moreover, there is no evidence in the record that supports the defendant's contention that he feared for his safety before he accelerated his vehicle.

Second, there is no substantial evidence in the record of an imminent use of unlawful force which would justify Rains' response. Until Rains accelerated the vehicle, the encounter had been routine and professional. It was only when Rains accelerated and attempted to throw Clark from the vehicle that Clark responded with force in an attempt to save himself.

Therefore, we conclude that the district court did not err in its decision not to submit the defendant's requested instructions on

self-defense. Substantial evidence did not exist to support submission of such instructions.

### VI. Expert Testimony

Prior to trial, the State moved to exclude the defendant's expert witness, Frank Saunders, who planned to testify regarding police procedure and the use of force. The district court reserved ruling on the matter. After the State had rested its case, it renewed its objection. The court granted the motion to exclude Saunders' testimony. The defendant then made an offer of proof by having Saunders testify outside the presence of the jury. Saunders testified that it was his belief that Officer Clark proceeded improperly in his encounter with the defendant. He contended Clark should have required Rains to exit the car and prohibited him from reaching across the car to retrieve his identification. Saunders also testified that Clark's action of maintaining his grip on Rains when the vehicle began moving and his subsequent attempts to pull himself into the vehicle were improper because they endangered the officer and others on the roadway. Saunders also criticized Clark's attempts to make Rains stop the vehicle, arguing that incapacitating Rains would only heighten the danger to Clark and other motorists. Finally, he objected to Clark's use of his firearm, citing the rule that deadly force can only be used by an officer when faced with deadly force. Following the offer of proof, the district court concluded that although Saunders was indeed an expert in these matters, he should not be allowed to testify, affirming its original ruling.

■■■ Issues involving the admission of expert testimony are generally within the trial court's discretion. We review for errors of law and the trial court's decision will not be overturned unless there has been an abuse of discretion. *See State v. Halstead,* 362 N.W.2d 504, 506 (Iowa 1985). This is a difficult standard to meet. *Id.* We are also mindful that "[t]he general rule in this jurisdiction is one of liberality in the admission of opinion evidence." *Id.* (citing *State v. Hummell,* 228 N.W.2d 77, 82 (Iowa 1975)). Iowa Rule of Evidence 702 provides the following standard for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Expert testimony is admissible if it is reliable and "will assist the trier of fact in resolving an issue." *State v. Brown,* 470 N.W.2d 30, 32 (Iowa 1991). The proponent of expert testimony bears the burden of showing that it will aid the trier of fact. *State v. Nelson,* 480 N.W.2d 900, 903 (Iowa App.1991).

■■■ We find the district court did not abuse its discretion in refusing to allow the testimony of Frank Saunders. No part of his proffered testimony would have "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 702. As discussed in the above section on the issue of justification, there was no evidence that Officer Clark used excessive force when he placed his hands on the defendant to emphasize his order to stop. Clark's later actions, while perhaps not the model of proper police conduct, were done during the heat of the confrontation and were utilized primarily to protect himself, not to subdue the defendant. Saunders' testimony would have tended to place blame on Clark, the victim in this case. In addition, as the trial court noted in its ruling on this matter, admission of this testimony may have confused the jury and clouded the relevant issues in this matter. The jury may have used the evidence to conclude that the officer's alleged failure to follow proper procedures excused the defendant's assaultive conduct.

### VII. Summary

We have considered each allegation of error proffered by the defendant. Because we find no error in the trial court's decisions on any of these issues, we affirm.

**AFFIRMED.**