**STATE of Iowa, Appellee,**

v.

**Raymond BRODENE, Appellant.**

**No. 90–1607.**

Supreme Court of Iowa.

Dec. 23, 1992.

Certiorari Denied March 1, 1993.

See 113 S.Ct. 1397.

Linda Del Gallo, State Appellate Defender, and Andi S. Lipman, Asst. State Appellate Defender, for appellant.

Bonnie J. Campbell, Atty. Gen., Richard J. Bennett, Asst. Atty. Gen., John P. Sarcone, County Atty., and Nan Horvat and Dan Voogt, Asst. County Attys., for appellee.

HARRIS, Justice.

We granted further review of a court of appeals decision reversing a first-degree murder conviction. Two assignments of error, asserting ineffective assistance of counsel, will be reserved for postconviction proceedings. We find no reversible error on the other two assignments and hence vacate the court of appeals decision and affirm the judgment of the district court.

Defendant Raymond Brodene was accused of shooting and killing a gas station attendant during a robbery and was charged with first-degree murder. A jury found him guilty of that crime, and he appealed the resulting conviction.

■ I. Between trial and sentencing, Brodene's trial attorney was allowed to withdraw and a new defense attorney was appointed. Brodene's new counsel filed a number of posttrial motions and requested a trial transcript. The new counsel noted he was not involved in Brodene's trial and was not present for any portion of it. He stated that trial counsel would not confer with him because it appeared an ineffective assistance of counsel claim would be raised.

The requested transcript was denied both before and after hearing. The failure to provide a transcript is Brodene's first assignment of error and it was on this ground that the court of appeals majority reversed his conviction.

Brodene contends it was unfair to force his new counsel to rely solely on his (Brodene's) memory of the trial, especially because he is not versed in the law and had no way of knowing what points were legally important. Brodene also noted that, because he was convicted of murder in the first degree, he would surely appeal his conviction, so a transcript would be needed in any event.

■ We readily agree that a transcript would ordinarily be necessary under these special circumstances. On the other hand there is no way the public can afford the cost of, nor can the judicial process provide the time for, transcript preparation in connection with routine posttrial motions. Trial counsel should ordinarily not be allowed to withdraw at such a point in the proceedings. Nearly all posttrial motions should be, and are, prepared and presented by counsel who tried the case and who are therefore familiar with the transcript. This is true even with respect to counsel who thereafter withdraw prior to appeal.

Because substitution of counsel was allowed in this case, it is obvious that a transcript was needed. Any error in not providing it can be ignored, however, because a transcript was later furnished in connection with this appeal. We can cure any error, and do so, by excusing the new counsel from any preservation of error requirements in preparing and presenting the posttrial motions. Appellate counsel does not contend that any assignments of error were omitted because they had not been preserved at the postsubmission stage.

■ II. Another assignment challenges a ruling sustaining the State's motion in limine which precluded Brodene from impeaching a prosecution witness. The witness had previously pled guilty to extortion, a matter Brodene sought to place before the jury.

The district court sustained the motion in limine on two grounds: (1) there is no clear Iowa authority holding extortion constitutes a crime of dishonesty or false statement, and (2) a guilty plea does not constitute a conviction under Iowa rule of evidence 609 until the entry of judgment.

■ A defendant's right to cross-examine a witness is the primary interest secured by the confrontation clause of the sixth amendment, made applicable to the states by the fourteenth amendment. *State v. Martin*, 385 N.W.2d 549, 552 (Iowa 1986). A defendant should be given reasonable latitude in cross-examining a

state's witness, particularly when charged with a grave offense. *Id.* Whenever witnesses testify, their credibility is placed in issue. *Id.* Although the question is undergirded by principles of the constitutional right of confrontation, Brodene concedes the ruling whether to admit the evidence is discretionary. *See id.*

■ Under rule 609(a), a witness may be impeached by a conviction when: (1) the crime involves dishonesty or false statement; (2) the crime is a felony, aggravated misdemeanor, or punishable by imprisonment for more than one year; and (3) the probative value of the evidence outweighs its prejudicial effect.

The first element is easily established; we think extortion is clearly an example of dishonesty. The second is shown by statute; extortion is a class "D" felony punishable for a term of imprisonment not to exceed five years. Iowa Code §§ 711.4, 902.9(4) (1991). The State does not argue that the third element is not established. The State's only argument concerns whether a mere guilty plea, without judgment and sentence, constitutes a conviction under rule 609(a).

■ So the issue comes down to whether, for the purpose of impeachment under Iowa rule of evidence 609(a), a guilty plea without judgment and sentencing constitutes a conviction. The question appears to be one of first impression.

When used in a statute or rule, the word "conviction" may have various meanings, depending on its purpose. *State v. Kluesner*, 389 N.W.2d 370, 372 (Iowa 1986); *State v. Ege*, 274 N.W.2d 350, 355 (Iowa 1979). A conviction required by statute is not necessarily equated with the entry of a sentence, but may only require an adjudication that the defendant is guilty of a charged offense. *See State v. Moyer*, 382 N.W.2d 133, 135–36 (Iowa 1986). We have said many of the authorities considering the meaning of "conviction" view it as a question of legislative intent. *State v. Hanna*, 179 N.W.2d 503, 508 (Iowa 1970).

Iowa authority is cited that, at first blush, supports the State's position. None of it however involves a guilty plea; all of it can be distinguished. *Ege* held that no impeachable conviction arises from a deferred judgment. 274 N.W.2d at 355. It is distinguishable because its result was dictated by the policies underlying deferred judgments. *Ege* relied on *Hackett v. Freeman & Graves*, 103 Iowa 296, 72 N.W. 528 (1897). *Ege*, 274 N.W.2d at 355–56. *Hackett*, interpreting a statute that was a predecessor to rule 609, made two points: (1) the term conviction "includes both the ascertaining of the guilt of the accused and judgment thereon by the court"; and (2) the pendency of an appeal neither annuls a conviction nor renders it incompetent for purposes of impeachment. 103 Iowa at 298–300, 72 N.W. at 529. The State relies on the first *Hackett* point. But we have previously hinted that the point is unreliable, and have noted it was issued "gratuitously." *See Ege*, 274 N.W.2d at 356. The second *Hackett* point supports Brodene's position. A guilty plea is an admission of guilt and obviously a strong indication that an impeachable offense occurred. An appeal, on the other hand, indicates a denial of guilt and contradicts the existence of an impeachable offense.

In *State v. Spears*, 312 N.W.2d 79 (Iowa App.1981), the court considered the propriety of impeachment on the basis of a jury's verdict of guilty to a burglary charge when the witness was awaiting imposition of sentence. *Spears* can also be distinguished. An attempt was made to impeach Spears as a witness in his own defense. On the basis of former Iowa Code section 622.17, the *Spears* court disallowed the evidence because, notwithstanding the burglary verdict, no judgment had been entered on it. Spears, as a witness in the second trial, though admitting his prior burglary *conviction*, did not admit he was guilty of it.

The State also relies on holdings in criminal cases that equate sentencing with final judgment. *State v. Anderson*, 246 N.W.2d 277, 279 (Iowa 1976); *State v. Aumann*, 236 N.W.2d 320, 321 (Iowa 1975); *State v. Coughlin*, 200 N.W.2d 525, 526 (Iowa 1972). These cases serve only to determine jurisdiction to hear appeals under former Iowa Code section 793.2 ("An appeal can

only be taken from the final judgment...."). *See* Iowa R.App.P. 101.

We think the witness's guilty plea to extortion amounted to a "conviction" for purposes of rule 609(a). This is because the word's meaning is to be gleaned in the light of the rule's purpose. That purpose is to set the boundaries for admitting evidence of a witness's past crimes. The rule allows placement of this information before the fact finder, but only to the extent it legitimately aids in testing the witness's credibility. The evidence rejected here must be said to qualify; it cast light that the jury might have found useful in determining the prosecution witness's reliability. We hold it should have been admitted. This holding makes it unnecessary for us to consider a second argument Brodene may or may not have preserved under rule of evidence 608(b).

 III. We find any error or abuse in rejecting the impeachment evidence was harmless beyond a reasonable doubt, a finding that is not to be made lightly. It is often urged to us that the expression "harmless error" is a contradiction in terms, that in a criminal trial, especially of this magnitude, no error can be harmless beyond a reasonable doubt.

 It is true that harmless error arguments are sometimes posited on the wrong foundation. The question is not whether an appellate court, omitting the evidence or testimony tainted by error, would certainly find the defendant guilty. We have understood the question rather to be whether the appellate court is satisfied beyond a reasonable doubt that the fact finder would have done so. This does not readily appear in most criminal cases. The reviewing court, for all its insight into the record, is most often hard pressed to surmise what answer to what question by what witness tipped the burden of proof and thus precipitated the verdict.

Even so, we conclude the harmless error doctrine is appropriate here. Even if the jury would have wholly rejected the witness's testimony on the basis of impeachment, other clear evidence overwhelmingly established Brodene's guilt. The witness here added little to the State's case except to bolster the placement of Brodene near the scene, a matter Brodene admitted. In summarizing this evidence we cannot improve upon the language in the court of appeals dissent, which we adopt as our own:

Brodene admitted he was at the gas station on Southwest 9th Street when the attendant was shot. A witness observed Brodene's car at the gas station about one hour before the victim was discovered, and he saw a man inside the vehicle. Another witness stopped by the station that evening between 6:30 and 7:30 p.m. She left when the attendant failed to respond to her attempt to activate the self-service gas pump. This witness heard something that sounded like firecrackers and saw a man in a black coat running from the back of the station with a noticeable limp. Brodene, who walks with a limp, was arrested wearing a black coat.

A cab driver testified he had picked Brodene up outside a business establishment called Tattoo Ted's Parlor at approximately 9:00 or 10:00 p.m. that night. Tattoo Ted's Parlor is located in the 4200 block of Southwest 9th Street. Brodene had told the cab driver he called for a cab because the transmission in his car had ceased functioning. The cab driver initially drove Brodene to the back of the lot in the rear of the tattoo parlor, where Brodene's car was parked, and Brodene locked his car. The cab driver then took Brodene to an apartment house on Southwest 9th Street.

The apartment house was the residence of Vicki Butler, a female friend of Brodene. Brodene stayed at Vicki Butler's residence for a short period of time before returning to the tattoo parlor in a second cab so he could arrange for his car to be towed to his home. Brodene had a police scanner with him and was listening to it intently. Brodene brought a jar of change with him to Butler's apartment. The jar was later identified as the coin jar taken from the station.

After returning to the tattoo parlor in a second cab, Brodene rode with the tow truck driver when he towed Brodene's car home. The tow truck driver testified Brodene acted "pretty nervous" and listened to a police scanner during the trip. Brodene said he had purchased the scanner the same day.

The charge for the tow was thirty-two dollars. Brodene paid the charge in one dollar bills which he drew from a large wad of bills he was carrying. When the tow truck driver counted the money, he discovered many of the bills were covered with blood. The blood was later determined to be human. The money bag which had been taken from the gas station was found the next day outside the tattoo parlor.

When a police officer approached Brodene at approximately 5:00 the next morning and asked "who he was" Brodene replied, "I'm the one you're looking for." Gunshot residue later taken from Brodene's hands was consistent with him having held a gun. Brodene admitted he had hidden the gun used to shoot the attendant at Vicki Butler's apartment. He claimed he had given his gun to Jeff Gunter when he was at the gas station working on his car because he was worried a police officer might stop by. Brodene testified he heard the sound of firecrackers when Gunter was in the station and Gunter had told him he accidentally shot the attendant and asked Brodene to take the gun. Brodene testified Gunter had gone to Butler's apartment to retrieve the gun on his own initiative.

Gunter testified he lives across the street from Brodene, and on the evening of the shooting, Brodene had come to his home, stated he was wanted for questioning, and offered Gunter twenty dollars to retrieve the gun from Butler's apartment. Gunter went to Butler's home and obtained the gun and a small pouch of ammunition. When Gunter returned home, he and Brodene watched the police search Brodene's home and car. Brodene then asked Gunter to keep the gun, and Gunter placed the gun outside in a doghouse. Later that after-noon, Gunter contacted the police and gave them the gun. The gun was later found to match bullets discovered at the gas station and recovered from the attendant's body. On the day of the robbery and murder, Brodene had told a friend he owed $1600 to drug dealers.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.

All Justices concur except LAVORATO, J., who takes no part.