**STATE of Iowa, Appellee,**

v.

**Aladdin RODRIQUEZ, Appellant.**

**No. 00-0763.**

Supreme Court of Iowa.

Nov. 15, 2001.

Douglas E. Johnston, Muscatine, for appellant.

Thomas J. Miller, Attorney General, Mary E. Tabor, Assistant Attorney General, Richard R. Phillips, County Attorney, and Dana Christensen and Teresa Stoeckel, Assistant County Attorneys, for appellee.

TERNUS, Justice.

The defendant, Aladdin Rodriquez, appeals his multiple criminal convictions arising out of an incident of domestic abuse. Concluding that evidence of prior and subsequent occasions of domestic abuse had been improperly admitted, the Iowa Court of Appeals reversed the defendant's convictions and remanded for a new trial. We granted the State's application for further review and now vacate the court of appeals

decision and affirm the district court's judgment of conviction and sentence.

## I. *Background Facts and Proceedings.*

Melinda Enriquez, age twenty, was seen in the emergency room of a Muscatine hospital on the evening of October 11, 1999. She reported that her boyfriend had beaten her, but she refused to identify him by name. She said her boyfriend hit her with a metal belt buckle, and hit her with his hand and kicked her with his feet in the head, chest, and abdomen. She also alleged her boyfriend stomped on her neck.

A physical examination revealed injuries consistent with this history. Enriquez had bruising around her nose, forehead, left eye and cheek. In addition there were bruises on the right side of her neck, her right upper chest, her lower left rib cage, across the upper part of the left shoulder, her right upper arm and the outer aspect of her left upper arm. Evidence of "sparing," a pattern often left at the site of impact of an object, was also noted. This sparing was consistent with being hit by a belt buckle with great force. Although x-rays revealed no fractures, there was some retropharyngeal soft tissue swelling in Enriquez's neck, indicating that her trachea had been depressed backward. In addition, Enriquez's abdomen was tender, and she was stiff and sore.

When a Muscatine police officer arrived at the hospital, Enriquez gave him several names for the perpetrator, but never identified her true assailant. It was not until a subsequent incident, approximately one month later, when the defendant chased Enriquez with a knife, that she informed the police that the defendant was responsible for her injuries of October 11, 1999.

On December 3, 1999, the defendant was charged with five separate offenses relating to the October 11 assault: (1) attempt-ed murder; (2) willful injury; (3) third-degree kidnapping; (4) aggravated domestic assault; and (5) serious domestic assault. *See* Iowa Code §§ 707.11, 708.4, 710.1, 710.4, 708.2A(2)(c), 708.2A(2)(b) (1999). The defendant pled not guilty.

Prior to trial, the State filed notice that it intended to introduce evidence from Enriquez and her mother regarding other incidents of abuse. The defendant objected to this evidence at trial, but the court permitted testimony by Enriquez about prior occasions of abuse and about the incident that occurred after the October 11 assault. Her mother corroborated this testimony. In addition to the testimony of these witnesses, the State called the emergency room physician who treated Enriquez for her injuries, the officer who interviewed Enriquez at the hospital, and an expert who testified about "the battered women's syndrome."

After the court overruled his motion for a directed verdict, the defendant took the stand. The defendant did not dispute that he had caused Enriquez's injuries, but claimed he was jealous and angry. He admitted that he assaulted Enriquez with a belt, hit her with his hand, and stepped on her cheek and neck. He denied choking Enriquez and denied confining her in their apartment.

After the defendant's testimony, the case was submitted to the jury. The jury found the defendant guilty of all charges except attempted murder. At his later sentencing, the defendant urged that the two domestic assault convictions should be merged in the willful injury conviction. The court declined to do so and sentenced the defendant to serve consecutive sentences for each charge of which he was convicted.

The defendant appealed, challenging his convictions on four grounds: (1) error in admitting evidence of prior and

subsequent bad acts; (2) error in allowing the domestic abuse expert to testify; (3) the trial judge was not impartial; and (4) error in failing to merge the assault convictions into the willful injury conviction.[1] We transferred the case to the court of appeals. That court reversed the defendant's convictions, concluding that the prior and subsequent bad acts evidence was improperly admitted. We granted further review.

## II. *Did the Trial Court Err in Admitting Evidence of Prior Bad Acts?*

■ A. *Scope of review.* This court "generally review[s] evidentiary rulings for abuse of discretion." *Williams v. Hedican,* 561 N.W.2d 817, 822 (Iowa 1997); *accord State v. Bugely,* 562 N.W.2d 173, 177 (Iowa 1997) (applying abuse of discretion standard in reviewing admission of other crimes evidence). An abuse of discretion occurs when the trial court exercises its discretion "on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Maghee,* 573 N.W.2d 1, 5 (Iowa 1997). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Graber v. City of Ankeny,* 616 N.W.2d 633, 638 (Iowa 2000).

■ B. *Analytical framework.* Iowa Rule of Evidence 404(b) addresses the admissibility of evidence of other bad acts. It states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that

he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Iowa R. Evid. 404(b). This court has recently observed that rule 404(b) "is a codification of our common-law rule that one crime cannot be proved by proof of another." *State v. Castaneda,* 621 N.W.2d 435, 439 (Iowa 2001). Thus, rule 404(b) seeks to exclude evidence that serves no purpose except to show the defendant is a bad person, from which the jury is likely to infer he or she committed the crime in question. *Id.* at 439–40. Accordingly, to be admissible, evidence must be relevant " 'to prove some fact or element in issue other than the defendant's criminal disposition.' " *Id.* at 440 (quoting *State v. Cott,* 283 N.W.2d 324, 326 (Iowa 1979)).

> Evidence is relevant ... "when it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " Evidence is relevant if a reasonable person might believe the probability of the truth of the consequential fact to be different if the person knew of the challenged evidence.

*State v. Brown,* 569 N.W.2d 113, 116 (Iowa 1997) (quoting *State v. Plaster,* 424 N.W.2d 226, 229 (Iowa 1988)).

■ If the evidence is relevant for a legitimate purpose, the court must then assess whether the evidence's "probative value is substantially outweighed by the

---

1. The defendant also alleged error in submission of the attempted murder charge to the jury. Because he was acquitted of that charge, any error in its submission was harmless. *State v. Sharpe,* 304 N.W.2d 220, 223–25 (Iowa 1981); *State v. Love,* 302 N.W.2d 115, 119 (Iowa 1981). In addition, the Double Jeopardy Clause precludes our review of a judgment of acquittal. *State v. Taft,* 506 N.W.2d 757, 760 (Iowa 1993). The defendant does not contend that any error with respect to the attempted murder charge infected his convictions of the other offenses.

danger of unfair prejudice." Iowa R. Evid. 403. " '[P]robative value' gauges the strength and force of" the evidence "to make a consequential fact more or less probable." *Plaster*, 424 N.W.2d at 231. Unfairly prejudicial evidence is evidence that

> "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case."

*Id.* (quoting 1 Jack B. Weinstein et al., *Weinstein's Evidence* ¶ 403[03], at 403–33 to 403–40 (1986) (now found at 2 Joseph M. McLaughlin, *Weinstein's Federal Evidence* § 403.04[1][c], at 403–40 to 403–44 (2d ed. 2001))). A proper weighing of probative value and unfair prejudice requires that the court consider

> "on the one side, the actual need for the other-crimes evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes evidence in supporting the issue, and on the other hand, the degree to which the jury will probably be roused by the evidence to overmastering hostility."

*State v. Wade*, 467 N.W.2d 283, 284–85 (Iowa 1991) (quoting Edward W. Cleary, *McCormick on Evidence* § 190, at 453 (2d ed. 1972) (now found substantially at 1 John W. Strong, *McCormick on Evidence* § 190, at 672 (5th ed. 1999) [hereinafter *McCormick on Evidence*])). Since our decision in *Wade*, we have stated that there must be "clear proof" that the defendant committed the prior bad acts. *Brown*, 569 N.W.2d at 117.

 Before we examine the ruling in this case, we briefly consider the standard of review in the context of the analysis required of the trial court. The abuse of discretion standard of review applicable in this matter recognizes that whether evidence of prior crimes should be admitted is a judgment call on the part of the trial court.

Analyzing and weighing the pertinent costs and benefits [of admitting prior acts evidence] is no trivial task. Wise judges may come to differing conclusions in similar situations. Even the same item of evidence may fare differently from one case to the next, depending on its relationship to the other evidence in the case, the importance of the issues on which it bears, and the likely efficacy of cautionary instructions to the jury. Accordingly, much leeway is given trial judges who must fairly weigh probative value against probable dangers. 1 *McCormick on Evidence* § 185, at 647–48. The complaining party—here the defendant—has "the burden of establishing that the trial court abused its discretion in the balancing process under rule 403." *Plaster*, 424 N.W.2d at 232.

 *C. Relevancy.* We first consider the trial court's conclusion that the evidence was relevant to a legitimate issue in the case. The trial court ruled that evidence of the defendant's prior assaults on Enriquez was relevant to the kidnapping charge, and we agree. To prove third-degree kidnapping, the State was required to show that the defendant confined Enriquez in the apartment, knowing that he did not have her consent to do so, with the intent to inflict serious injury upon her or with the intent to secretly confine her. Iowa Code § 710.1(3), (4). The relevancy of the prior bad acts evidence is best understood in the context of the record with respect to the kidnapping charge. Therefore, we turn now to the pertinent testimony of the witnesses.

Enriquez testified that at approximately 3:00 a.m. on the morning of October 11, 1999, the defendant became angry when she refused his request to have sex. The defendant accused Enriquez of being unfaithful, they argued, and she told him she was going to leave him. This statement caused the defendant to become even angrier and he began forcefully hitting her with the metal buckle of a belt. (The viciousness of this attack was highlighted by Enriquez's testimony that one of the blows from the belt broke her skin and resulted in a permanent scar.) When Enriquez tried to run out of the bedroom, he grabbed her by the hair, hit her again with the belt, pushed her back into the bedroom, and told her to be quiet. He said that he didn't want her to leave because the day she leaves she "will be six feet underground." Enriquez understood this statement to mean that Rodriquez would kill her.

Enriquez lay down in the corner of the room and "didn't move so [the defendant] wouldn't hit [her] again." During this time, the defendant positioned himself on top of the bed by the door, purportedly to prevent Enriquez from escaping. Eventually, the defendant calmed down and apologized. Nevertheless, Enriquez testified that she was not allowed to leave the bedroom during the entire day on October 11. She said Rodriquez continued to sit on the bed by the door "watching [her] the whole time."

In the late afternoon or early evening of October 11, Enriquez told the defendant that she was tired of him hitting her and she was going to leave him. He became enraged and began hitting her with the belt. When she tried to defend herself, he began punching her. When she fell to the floor, he stomped on her neck "to the point where [she] couldn't breathe" and her "vision went black." She testified she thought she was going to die.

Shortly after the defendant removed his foot from Enriquez's neck, she was allowed to go to the bathroom. As she was wiping blood off her face, her mother, Carmela Escobedo, arrived. Upon seeing her daughter, Escobedo became nauseated. Escobedo begged the defendant to let her take her daughter to the hospital, but he refused. Eventually, when some of the defendant's friends arrived at the apartment, Enriquez and her mother were able to escape and drive to the emergency room.

Enriquez was also questioned about her tumultuous relationship with the defendant. This testimony included the defendant's physical abuse of Enriquez, including incidents where the defendant punched her, threatened her with a gun, attempted to strangle her, slapped her, twisted her arm, burned her lips with a curling iron, and hit her in the abdomen causing her to suffer a miscarriage. Enriquez said that Rodriquez had threatened to harm her or kill her if she ever reported his abuse. She also testified that these incidents almost always began when she announced an intention to leave Rodriquez, or simply said she wanted to visit her mother. Enriquez did not go into great detail with respect to these prior assaults, as evidenced by the fact that her testimony on this subject during direct examination comprised less than six pages of the 274-page trial transcript.

On cross-examination, defense counsel sought to establish that Enriquez did not stay with the defendant out of fear or intimidation, but out of love. Counsel made a point of emphasizing that Enriquez returned to live with the defendant after the October 11 incident.

Enriquez's mother corroborated prior incidents of abuse that she had personally witnessed, as well as bruises and injuries she observed on her daughter. Escobedo also recalled occasions when she overheard

the defendant threaten Enriquez's life. Her direct-examination testimony concerning prior abuse occupied less than four pages of the transcript.

As noted earlier, the defendant testified in his own defense. The defendant admitted hitting Enriquez with the belt, striking her in the face and arms with his hands and fists, stepping on her cheek and neck, and in general causing the "nasty" injuries shown in photographs of Enriquez taken at the hospital and a few days later. Rodriquez acknowledged this conduct was wrong, that he was guilty of assault, and that he would be punished for it. Then, in his attorney's words, the defendant was questioned "about the elements and the five counts [the defendant was] here for." In response to his attorney's questions, the defendant denied that he ever confined Enriquez in the apartment or kept her from leaving. The defendant testified that it was not his intention to keep Enriquez from leaving and that he was not trying to kill her. He said he did not intend to cause a serious injury, any permanent disfigurement, or any permanent damage to Enriquez's body or mind. Rodriquez testified that he simply lost his temper and beat Enriquez out of anger and jealousy. He said Enriquez was always free to leave the bedroom.

We think the evidence of prior assaults is relevant to the existence of several consequential facts: (1) whether Enriquez was "confined" for purposes of the kidnapping charge; (2) whether the defendant intended to cause a serious injury to Enriquez for purposes of the willful injury and kidnapping charges; and (3) whether the defendant intended to secretly confine Enriquez for purposes of the kidnapping charge. With respect to the confinement issue, the jury was instructed that "[a] person is 'confined' when her freedom to move about is substantially restricted by force, threat or deception." The fact that the defendant had cruelly assaulted Enriquez in the past when she tried to leave him makes it more probable that his mere presence in the bedroom was intended—and perceived—to be a threat of harm calculated to prevent her from leaving. In addition, evidence of the defendant's prior intentional, violent acts towards the victim coupled with his prior threats to kill her if she left him also makes it more probable that he intended to cause her serious injury on October 11, in contrast to his claim that the injuries he inflicted that day were merely unintended, incidental consequences of his anger. *See State v. Haskins,* 573 N.W.2d 39, 45–46 (Iowa Ct.App.1997) (finding evidence of prior assault against victim relevant to intent of defendant charged with attempted murder of victim).

■ D. *Probative value versus prejudicial effect.* Having concluded that the evidence is relevant, we now consider whether the trial court abused its discretion in deciding that the probative value of this evidence outweighed its inherently prejudicial effect. Our first inquiry is "the actual need for the ... evidence in the light of the issues and the other evidence available." *Wade,* 467 N.W.2d at 284. The circumstances surrounding the alleged confinement of Enriquez on October 11 were disputed by the only persons present: the defendant and Enriquez. In light of the "he said/she said" nature of this disagreement, the need for other evidence on the issue of confinement was substantial.

In addition to the fact the challenged testimony was needed, the strength of the admitted evidence on the element of confinement, as well as intent, was high. In this regard, it is significant that there was no evidence that Enriquez was tied up or locked in the bedroom. Rather the fact of confinement turned on whether Rodriquez's mere presence in the bedroom be-

tween Enriquez and the door constituted a force or threat that substantially restricted her freedom to move. The prior bad acts evidence was highly probative on this matter, making it more probable that Rodriquez's act of remaining in the bedroom operated as a confinement of Enriquez. *See generally State v. Laible,* 594 N.W.2d 328, 335 (S.D.1999) (explaining rationale for admission of defendant's prior threats toward and abusive treatment of victim: "an accused's past conduct in a familial context tends to explain later interactions between the same persons").

The final factor, whether there was clear proof that the defendant committed the prior acts, also supports admission of this evidence. Not only did Enriquez testify to these incidents, but her mother corroborated many of the abusive events and threats.

■■■ On the other side of the balancing process, the trial court was required to consider the degree of prejudice that would result from admission of the prior acts testimony.[2] Certainly this evidence would have the capability of producing unfair prejudice in the jury, such as a desire to punish the defendant. But the effect of this evidence must be put in perspective. The State did not elicit great detail about the prior assaults and spent a relatively small amount of time on this line of questioning. In addition, unlike most criminal defendants, the defendant here admitted he was the perpetrator of the charged assault.[3] He even acknowledged that he caused the vicious injuries to Enriquez shown in the pictures. The prior assaults to which Enriquez testified were no more brutal than the October 11 assault admitted by the defendant. Therefore, this is not a case where *the prior acts evidence* would rouse the jury to "overmastering hostility."[4] *See State v. Larsen,* 512 N.W.2d 803, 808 (Iowa Ct.App.1993) (holding that potential prejudicial effect of subsequent acts evidence was "neutralized by equally reprehensible nature of the charged crime"). Moreover, the fact that the defendant admitted the October 11 assault removed any danger that the prior acts evidence would be used to show that on October 11 he acted in conformity with his prior acts and therefore was the perpetrator. *See Godbersen v. Miller,* 439 N.W.2d 206, 209 (Iowa 1989) (stating that prejudicial effect of prior acts evidence was weakened by defendant's admission with respect to the current crime).

On balance, we cannot say that the trial court did not fairly weigh the probative value of the evidence against the probable dangers of admitting it. We think the trial court's resolution of this delicate balancing process was reasonable and did not consti-

---

**2.** Prejudice to the defendant can be limited with the use of a cautionary instruction explaining the purpose for which the prior acts evidence may be used. *See Plaster,* 424 N.W.2d at 232. Here the defendant did not request a limiting instruction and none was given. In the future, trial courts would be wise to give such an instruction to the jury, even if not specifically requested by the defendant, whenever bad acts evidence is introduced for a limited purpose.

**3.** Although the defendant had not testified at the time the trial court ruled on the admissibility of the prior acts evidence, the court was aware that the defendant did not dispute that he had committed the October 11 assault because defense counsel acknowledged in his opening statement that the defendant conceded he was guilty of at least one of the assault charges.

**4.** If the jury in this case had been motivated to overwhelming hostility toward the defendant by the prior acts evidence, it seems likely the jury would have convicted the defendant of the attempted murder charge. To the contrary, the jury acquitted Rodriquez of this offense, which was the most serious charge on which he was tried.

tute an abuse of discretion. Accordingly, we affirm the trial court's decision to permit evidence of prior bad acts by the defendant.

### III. Did the Trial Court Err in Admitting Evidence of the Subsequent Act of Abuse by the Defendant?

Our scope of review and the governing legal principles have been set forth in the preceding division and will not be repeated here. The evidence challenged by the defendant consisted of testimony by Enriquez that in November, after the October 11 assault, she and Rodriquez had another altercation. Enriquez was leaving for work and the defendant wanted her to come straight home when she was done. She refused to agree to this demand, so he told her she could not leave. The defendant then took her money. When she proceeded to walk out the door, he tried to pull her back in by the hair. Rodriquez then ran back into the apartment, got a knife, and began chasing Enriquez. Escobedo, Enriquez's mother, witnessed this event. After this incident, Enriquez called the police and reported the November assault and identified Rodriquez as the assailant in the October assault.

We will not engage in an analysis of the relevancy of this evidence nor will we review the trial court's balancing of the probative value of the evidence against its prejudicial effect. We do not do so because we think that even if the evidence was improperly admitted, such admission was harmless error.

Reversal is not required for the erroneous admission of evidence unless prejudice results. State v. Liggins, 524 N.W.2d 181, 188 (Iowa 1994); State v. Windsor, 316 N.W.2d 684, 688 (Iowa 1982). In determining the prejudicial effect of evidence, the court reviews the other evidence presented and "weigh[s] it against

any prejudicial effect." State v. Holland, 485 N.W.2d 652, 655 (Iowa 1992). "To establish prejudice, [the defendant] must show a reasonable probability that but for the error the outcome of the trial would have been different." State v. Crone, 545 N.W.2d 267, 273 (Iowa 1996). Although it is difficult for a reviewing court "to surmise what answer to what question by what witness tipped the burden of proof and thus precipitated the verdict," where the other evidence overwhelmingly establishes the defendant's guilt, we have applied the harmless error doctrine. State v. Brodene, 493 N.W.2d 793, 797 (Iowa 1992).

We think that even without the subsequent bad acts evidence, there was overwhelming evidence of the defendant's guilt. He admitted the assault. Both Enriquez and her mother testified that even after Escobedo arrived at the apartment on October 11, the defendant still would not allow Enriquez to leave. The emergency room physician corroborated both the nature and extent of Enriquez's injuries. In addition, he testified to the force that was required to inflict these injuries as well as the fact that the injury to Enriquez's trachea could have been life threatening. This evidence, together with the prior bad acts evidence we have previously detailed, supported each element of the crimes of which the defendant was convicted, including the elements of confinement and specific intent, which he had disputed. When we weigh this evidence against the prejudicial effect of the subsequent bad acts evidence, we do not think the defendant was prejudiced. The prejudicial effect of the subsequent bad acts evidence was minimal when viewed in the context of the other evidence of the defendant's assaultive behavior already in the record. We simply cannot conclude that but for the admission of the subsequent bad acts evidence, the outcome of the trial would have been different. For

these reasons, we hold that the admission of evidence of the November assault, even if erroneous, was harmless.

### IV. *Did the Trial Court Err in Admitting the Expert's Testimony?*

▮▮▮▮▮▮ Our standard of review is the same for this alleged error as it was in considering the admission of bad acts evidence: abuse of discretion. *See State v. Rains,* 574 N.W.2d 904, 916 (Iowa 1998) (considering whether court abused its discretion in admission of expert testimony). Thus, the trial court's decision will not be overturned unless the trial court "exercised [its] discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Maghee,* 573 N.W.2d at 5. Additionally, we note "[t]he general rule in this jurisdiction is one of liberality in the admission of opinion evidence." *State v. Halstead,* 362 N.W.2d 504, 506 (Iowa 1985).

▮▮▮▮ Our rules of evidence provide the following standard for the admission of expert testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Iowa R. Evid. 702. In other words, "[e]xpert testimony is admissible if it is reliable and 'will assist the trier of fact in resolving an issue.'" *Rains,* 574 N.W.2d at 916 (quoting *State v. Brown,* 470 N.W.2d 30, 32 (Iowa 1991)).

▮▮▮▮ The evidence at issue in the present case consists of the testimony of Rachel Smock, who was a supervisor in the Sexual Assault and Domestic Abuse Advocacy Program in Muscatine. She described the elements of a domestic violence relationship, or "the cycle of violence," and how different aspects of power and control, the core of domestic violence, are used by the abuser against the victim. Smock noted it is very common for the abuser to refuse to let a victim see her family and to isolate the victim from others so they do not know what is going on. This isolation, she testified, also commonly extends to controlling the victim's ability to work and her access to economic resources, as well as access to medical care and treatment.

Smock also testified to what is referred to as "the battered women's syndrome." She opined that continued exposure to domestic abuse leads to a feeling of helplessness, where the victim often begins to believe what she is being told by her abuser, i.e., that she is ignorant, stupid, ugly, a terrible mother, etc. The victim feels trapped and unable to leave. Smock said that statistically, "the national average is it takes usually about seven times for a woman to go back and forth before [she] finally make[s] the ultimate decision to leave." Additionally, Smock noted that it is common for a battered woman to deny that the incident took place, be reluctant to testify against her batterer, and refuse to assist in the prosecution. Often these reactions are out of fear. Smock also testified that statistically, a battered woman is in the most danger when she tries to leave an abusive relationship. Finally, Smock informed the jury that although she had met the victim in this case, she did not have any personal information about the facts of the case at hand.

The defendant does not challenge Smock's qualifications to render the testimony we have summarized. His argument is that the testimony was not relevant because he did not deny assaulting Enriquez, nor did Enriquez ever recant her story so as to put her credibility at issue.

Although the defendant did not deny his assault on Enriquez, he sought to prove

that he did not intend to seriously injure her and that he did not confine her against her will. Thus, it was necessary for the defendant to attack the victim's contrary testimony. In cross-examining Enriquez, the defense elicited testimony that she returned to live with Rodriquez despite the October 11 assault, that the defendant allowed her to go to work, and that she and Rodriquez did have some "good times" together. The thrust of this questioning was to create an impression that the assault was not as bad or as serious as Enriquez claimed and that she had not really been confined as a result of the defendant's presence in the bedroom and his threat.

We think Smock's testimony allowed the jury to view both the defendant's and the victim's behavior in the context of the nature of their relationship, which clearly reflected a "cycle of violence." Moreover, the testimony of the expert on battered women's syndrome gave the jury information that it needed to understand the significance and meaning of the defendant's conduct and to understand the victim's reaction to that conduct. Thus, this evidence assisted the jury in resolving the disputed issues of confinement and intent. We conclude, therefore, that the trial court did not abuse its discretion in admitting this testimony. *Cf. State v. Griffin*, 564 N.W.2d 370, 374 (Iowa 1997) (allowing expert testimony about battered women's syndrome on issue of victim's credibility where, prior to trial, she had recanted her accusation of defendant); *State v. Gettier*, 438 N.W.2d 1, 6 (Iowa 1989) (allowing, in criminal trial for sexual abuse, expert testimony on "rape trauma syndrome" suffered by victims of sexual abuse).

### V. *Did the Trial Judge Fail in His Duty of Impartiality?*

■ The defendant has failed to state in his brief how error was preserved on this issue. *See* Iowa R. App. P. 14(a)(5) (requiring appellant to state in his or her brief how each issue was preserved for review, "with references to the places in the record where the issue was raised and decided"). We cannot locate a motion for recusal in the trial court record, nor do we find any indication that Rodriquez ever objected to the trial judge presiding over his case. In addition, the defendant has offered no reason on appeal as to why he did not have to preserve error on this issue by making an objection or some sort of record in the district court. Therefore, we consider this issue waived. *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 866 (Iowa 2001); *cf. State v. Potts*, 240 N.W.2d 654, 656 (Iowa 1976) (holding that assignment of error not supported by argument or authority was waived).

### VI. *Did the Trial Court Err in Failing to Merge the Assault Convictions Into the Willful Injury Conviction?*

■ Rodriquez claims that Iowa Code section 701.9 required the trial court to merge his convictions for aggravated domestic abuse assault and serious domestic abuse assault into his conviction for willful injury. We review this claim for correction of legal error. *State v. Anderson*, 565 N.W.2d 340, 342 (Iowa 1997).

The merger doctrine in Iowa is expressed in section 701.9:

No person shall be convicted of a public offense which is necessarily included in another public offense of which the person is convicted. If the jury returns a verdict of guilty of more than one offense and such verdict conflicts with this section, the court shall enter judgment of guilty of the greater of the offenses only.

Iowa Code § 701.9. This court has recently stated the legal principles applicable to application of the merger doctrine:

In determining whether a lesser offense is included in a greater one, we look to the elements of each and determine if the greater offense can be committed without also committing the lesser offense. If the greater offense cannot be committed without also committing the lesser offense, the lesser is included in the greater. We call this the "impossibility" test. The so-called "elements" test for included offenses is applied only as an aid in using the impossibility test and is fully subsumed in it.

*State v. Hickman,* 623 N.W.2d 847, 850 (Iowa 2001) (citations omitted).

The court instructed the jury on the following elements of the charge of aggravated domestic abuse assault:

1. On or about the 11th day of October, 1999, the defendant either did an act which was meant to cause pain or injury, result in physical contact which was insulting or offensive, place Melinda Enriquez in fear of immediate physical contact which would have been painful, injurious, insulting or offensive to her, or displayed in a threatening manner a dangerous weapon toward Melinda Enriquez.

2. The defendant had the apparent ability to do the act.

3. At that time the defendant used or displayed a dangerous weapon or intended to cause a serious injury to Melinda Enriquez.

4. The act occurred between household members who resided together at the time of the incident.

The charge of serious domestic abuse assault was submitted in a separate instruction. The second and fourth elements of serious domestic abuse assault were identical to the second and fourth elements of the charge of aggravated domestic abuse assault. The first element varied slightly; the first element for serious domestic abuse assault did not include the alternative referring to display of a weapon, found in the first element for the aggravated assault offense. The third elements of these crimes were entirely different. For the serious domestic abuse assault, the jury was required to find that "[t]he defendant's act caused bodily injury to the victim."

We now contrast the elements of these charges with the elements of willful injury:

1. On or about the 11th day of October, 1999, the defendant attempted to choke and repeatedly struck Melinda Enriquez.

2. The defendant specifically intended to cause a serious injury to Melinda Enriquez.

3. Melinda Enriquez sustained a bodily injury.

It is at once apparent that the domestic abuse assault charges contain an element not found in the willful injury charge: "The act occurred between household members who resided together at the time of the incident." Thus, it is possible to commit the greater offense without also committing the lesser offenses. Consequently, the domestic abuse assault convictions are not "necessarily included" in the willful injury conviction.

Because aggravated domestic abuse assault and serious domestic abuse assault are not included offenses of willful injury, the merger requirement of section 701.9 does not apply. Therefore, the trial court did not err in entering separate judgments and sentences for each conviction.

## VII. *Summary and Disposition.*

The trial court did not abuse its discretion in admitting evidence of prior acts of domestic abuse by the defendant against the victim. Error, if any, in admitting evi-

dence of a subsequent act of domestic violence was harmless. We also hold that the trial court did not abuse its discretion in admitting expert testimony on the battered women's syndrome. The defendant failed to preserve error on his claim that the trial judge was not impartial. And finally, we conclude the trial court was correct in ruling that the defendant's convictions for aggravated domestic abuse assault and serious domestic abuse assault should not have been merged into the conviction for willful injury as the former crimes are not included offenses in the latter crime. Finding no error or abuse of discretion in the trial court's rulings, we affirm the defendant's convictions.

### DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.

All justices concur except, LAVORATO, C.J. and CARTER, J., who dissent and STREIT, J., who takes no part.

LAVORATO, Chief Justice (dissenting).

For good reason, courts have long followed the rule against admitting bad-acts evidence "for the purpose of showing that the defendant has a criminal disposition in order to generate the inference that he committed the crime with which he is charged." *United States v. Myers*, 550 F.2d 1036, 1044 (5th Cir.1977). As the court in *Myers* observed, "[a] concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is." *Id.* This rule is "fundamental to American jurisprudence." *United States v. Foskey*, 636 F.2d 517, 523 (D.C.Cir.1980).

Courts also recognize the critical importance of guarding against incursions on the rule, not because bad-acts evidence has no probative value, but for the very reason that such evidence may have very substan-

tial probative value not recognized in law. *United States v. Goodwin*, 492 F.2d 1141, 1155 (5th Cir.1974). Therefore, "[t]he exclusion of bad-acts evidence is founded not on a belief that the evidence is irrelevant, but rather on a fear that juries will tend to give it excessive weight, and on a fundamental sense that no one should be convicted of a crime based on his or her previous misdeeds." *United States v. Daniels*, 770 F.2d 1111, 1116 (D.C.Cir.1985). Empirical studies have confirmed that juries treat such evidence as highly probative. *Id.; see also State v. Most*, 578 N.W.2d 250, 254 (Iowa Ct.App.1998) ("In any case where prior crimes evidence is offered, the court must consider the strong tendency for the jury to use it for an improper purpose.").

Bad-acts evidence "diverts the attention of the jury from the question of defendant's responsibility for the crime charged to the improper issue of his bad character." *United States v. Phillips*, 401 F.2d 301, 305 (7th Cir.1968). Consequently, even if the trial judge gives a carefully crafted instruction limiting the significance of such evidence, prejudice to the defendant is "well-nigh inescapable." *United States v. Carter*, 482 F.2d 738, 740 (D.C.Cir.1973). The rule against bad-acts evidence is therefore " 'just and wise' in order to avoid the enormous danger of prejudice to the defendant that [such evidence] creates." *United States v. San Martin*, 505 F.2d 918, 921 (5th Cir.1974).

Finally, courts recognize

that the various categories of exceptions [to the bad-acts evidence]—intent, design or plan, identity, etc.—are not magic passwords whose mere incantation will open wide the courtroom doors to whatever evidence may be offered in their names. To the contrary, each exception has been carefully carved out of

the general rule to serve a limited judicial and prosecutorial purpose.

*Goodwin,* 492 F.2d at 1155. These exceptions, courts have cautioned, "should not be permitted to swallow the rule." *San Martin,* 505 F.2d at 921 (quoting *United States v. Miller,* 500 F.2d 751, 762 (5th Cir.1974)).

Our Rule of Evidence 404(b) controls the admissibility of bad-acts evidence. It provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Iowa R. Evid. 404(b).

Consistent with the foregoing authority, we have noted that rule 404(b)

> recognizes two fundamental principles: first, that evidence of other bad acts is relevant to whether a defendant committed the charged crime, and second, the reality that such evidence, while highly probative, is also highly prejudicial to a defendant. The rule attempts to balance these competing interests by presuming that the [bad-acts] evidence is inadmissible and placing the burden on the State to show the evidence is relevant for some purpose other than to show the defendant acted in a manner conforming to the other bad acts. *See State v. Cott,* 283 N.W.2d 324, 326 (Iowa 1979) ("The purpose of the rule is to exclude from the jury's consideration evidence which has no relevancy except to show the defendant is a bad person and thus likely committed the crime in question.").

*State v. Mitchell,* 633 N.W.2d 295, 298 (Iowa 2001).

The listed exceptions in rule 404(b) are not exclusive. *Id.* The critical issue is "whether the disputed evidence is 'relevant and material to some legitimate issue other than a general propensity to commit wrongful acts.' " *Id.* (quoting *State v. Barrett,* 401 N.W.2d 184, 187 (Iowa 1987)). "If the challenged evidence is relevant to a legitimate issue in dispute, then it is prima facie admissible, regardless of any tendency to also establish a defendant's bad character or propensity for committing bad acts." *Id.* However, courts do not look with favor upon bad-acts evidence and its use "must be narrowly circumscribed and limited." *United States v. Hodges,* 770 F.2d 1475, 1479 (9th Cir.1985) (quoting *United States v. Bailleaux,* 685 F.2d 1105, 1109 (9th Cir.1982)).

To determine whether such disputed evidence is admissible, courts engage in a two-step process. *Mitchell,* 633 N.W.2d at 298. First, the court must determine whether the bad-acts evidence is relevant to a legitimate factual issue in dispute. *Id.* If the court determines such relevancy exists, it then decides whether the probative value of the bad-acts evidence is substantially outweighed by the danger of unfair prejudice to the defendant. *Id.;* Iowa R. Evid. 403. An affirmative finding in this balancing process overcomes the evidence's prima facie admissibility. *Mitchell,* 633 N.W.2d at 298. The court must then exclude the evidence. *Id.* However, in employing this two-step process, courts must keep in mind that bad-acts evidence "must be carefully scrutinized to determine probative value." *United States v. Back,* 588 F.2d 1283, 1287 (9th Cir.1979).

As the majority states, each step invokes the district court's discretion. But that discretion has parameters:

> It should be recognized, however, that this is not a discretion to depart from the principle that evidence of other

crimes, having no substantial relevancy except to ground the inference that accused is a bad man and hence probably committed this crime, must be excluded. The leeway of discretion lies rather in the opposite direction, empowering the judge to exclude the other-crimes evidence, even when it has substantial independent relevancy, if in his judgment its probative value for this purpose is outweighed by the danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial. Discretion implies not only leeway but responsibility. A decision clearly wrong on this question of balancing probative value against danger of prejudice will be corrected on appeal as an abuse of discretion.

*Mitchell,* 633 N.W.2d at 299 (quoting *State v. Johnson,* 224 N.W.2d 617, 621 (Iowa 1974)).

My disagreement with the majority stems from the required balancing process stated in rule 403. I will therefore focus my discussion on that process as it relates to this case and point out the flaws that I think require reversal because of an abuse of discretion.

I begin by noting that

[w]hile trial courts have discretion in striking the balance between probative value and unfair prejudice ... they must be particularly sensitive to the potential prejudice that is always inherent in evidence of an accused's prior uncharged crimes or wrongs.... Although Rule 403 provides broad umbrella protection from unfair or undue prejudice, the specific provision of Rule 404(a) prohibiting evidence of uncharged crimes to show bad character or tendencies toward criminality not only reflects the special danger of other crimes evidence but

should alert trial courts to be particularly careful in admitting such evidence. *United States v. Carleo,* 576 F.2d 846, 849 (10th Cir.1978) (citations omitted).

When intending to introduce bad-acts evidence, the State not only has the duty to show the trial court how the proffered evidence is relevant to one or more issues in the case, it must also articulate precisely the applicability of a rule 404(b) exception. *See People v. Golochowicz,* 413 Mich. 298, 313, 319 N.W.2d 518, 523 (1982) (holding that when requesting admission of bad-acts evidence, prosecutor's first duty is to specify the rule 404(b) exception upon which the State relies and noting that while in some instances the evidence might be admissible for more than a single purpose, that is not usually the case).

Additionally, the trial court must identify the applicable exception. *United States v. Beasley,* 809 F.2d 1273, 1279 (7th Cir. 1987). A broad statement merely invoking or restating rule 404(b) will not suffice. *See Golochowicz,* 319 N.W.2d at 523 (holding that trial court should require the prosecutor to "identify the specific basis in the rule justifying its admission"). This requirement not only ensures that a decision to admit or exclude bad-acts evidence will be made only after issues and reasons are exposed and clearly stated, but it also greatly aids an appellate court in its review of these evidentiary issues.

That brings me to the first flaw regarding the rule 403 balancing process in this case. In the hearing on the defendant's motion in limine to exclude the prior and subsequent bad-acts evidence regarding the assaults, the prosecutor took the "shotgun" approach:

This is a relationship not of real long standing but of some number of—almost a year, something like that, over the course of which a number of violent acts have been perpetrated upon [the victim].

We offer those to notice the defendant's acts ... conform with some kind of bad character or to prove that he must have done this when he did those. Our point is to show his motive, his intent, the lack of mistake, lack of an accident, involved here.

Of course, by his statement, the prosecutor indicated he was using the evidence for the very reason bad-acts evidence is excluded—"to prove his bad character or to prove that he must have done this when he did those." The prosecutor did not even mention the key issues that the majority emphasizes the disputed evidence was necessary to prove: confinement with the intent to inflict serious injury. Rather than articulate the key issues and the necessary inferences arising from disputed evidence to prove those issues, the prosecutor simply mouthed the various exceptions in rule 404(b).

On this last point, one appellate court observed:

> Experience in the trial courtroom and review of trial records on appeal suggests rather incontrovertibly that, when asked by the trial judge to specify the grounds for admission of similar-acts evidence, prosecutors often loose a "shotgun" fusillade of reasons which typically include most, if not all, of the purposes named in the statute. Such a response hints, of course, if it does not demonstrate, that the prosecutor has an inadequate understanding of the correct application of the rule and is unclear as to precisely why the evidence is or is not admissible.

*Golochowicz,* 319 N.W.2d at 523–24 (footnote omitted).

The trial court likewise mentioned all of the exceptions the prosecutor mentioned but in addition threw in opportunity, preparation, plan, and knowledge to prove confinement for the kidnapping charge. The court, however, said nothing regarding the intent to commit serious injury. Nor did the court mention whether the evidence was not more unfairly prejudicial than probative of the issues for which the bad-acts evidence was offered. On this point, the court in *Golochowicz* had this advice for trial courts:

> Similarly, trial judges, when admitting evidence of other crimes, should avoid doing so with the vague justification that "I'll let it in for what it is worth," or "I'll allow it to show plan, scheme or system," when that is the basis suggested by the prosecutor, without requiring a showing by the prosecutor as to how such evidence is relevant to show plan, scheme or system or how plan, scheme or system is material to the case, or, most importantly, whether the evidence, if indeed relevant and material, is not more unfairly prejudicial than probative of the proposition for which it is offered.

*Id.* at 524.

One of the disturbing things about the trial court's ruling on the motion in limine is the reason it gave for admitting the subsequent assaults: to bolster the victim's credibility. Clearly, according to our decision in *Mitchell,* this was error. *See Mitchell,* 633 N.W.2d at 299–300 (holding that bad-acts evidence is not admissible to bolster credibility). The majority dismisses admission of this evidence as harmless error because the evidence was not prejudicial. I disagree. For reasons that follow, I think this evidence along with the prior assaults was highly and unfairly prejudicial to the defendant. The trial court's failure to recognize this prejudice is the second flaw regarding the rule 403 balancing process.

Our cases define "unfair prejudice" in rule 403 as "an undue tendency to suggest decisions on an improper basis, commonly

though not necessarily, an emotional one." *State v. Plaster*, 424 N.W.2d 226, 231 (Iowa 1988) (adopting definition from advisory committee's note to Federal Rule of Evidence 403). Thus, evidence is unfairly prejudicial when it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case." *Id.* at 231–32 (quoting 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 403[03], at 403–33—40 (1986)).

When jurors hear that a defendant, on earlier occasions, has committed essentially the same bad acts for which the defendant is on trial, "the information unquestionably has a powerful and prejudicial impact." *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir.1994). And regardless of the stated purpose of such evidence, "the likelihood is very great that the jurors will use the evidence precisely for the purpose it may not be considered"—to convict the defendant because he is a bad person. *Id.; see also State v. Daly*, 623 N.W.2d 799, 803 (Iowa 2001) (suggesting that admitting evidence of prior convictions for impeachment purposes, which were exactly the same crimes for which defendant was on trial, "could very likely have a substantial effect on a jury, which, although instructed not to do so, could reasonably be expected to misuse the evidence as substantive proof of guilt").

The prior and subsequent bad acts here involved the same kinds of acts the State was relying on to convict the defendant of the offenses charged. The majority tries to minimize the prejudicial effect of such acts by stating the State did not elicit great detail about the prior bad acts—assaults—and spent a relatively small amount of time on this line of questioning.

As to the prior assaults, the victim testified that the defendant beat her so many times, in private and in public, that she "stopped counting." She described how on one occasion the defendant put a gun to her head. In describing other incidents of assault, she testified as follows:

Q. Have you suffered any other injuries that we haven't talked about here so far from him? A. Yes.

Q. What's the worst? . . . A. Where he burned me with a curling iron in my mouth.

. . . .

Q. What kind of injury did that give you that you had to go to the hospital? A. When he took the curling iron off, my whole skin melted and stuck to the curling iron. . . . . [Later the victim testified that an argument led to this action during which the defendant tried to strangle her with the curling iron.]

. . . .

Q. Have you had any children by [the defendant]? A. I was pregnant at one time.

. . . .

Q. What happened then? A. . . . I told him I was pregnant. We got into a fight. He punched me in the stomach. He just kept on beating me some more to the point where I lost the baby.

As to the assault subsequent to the one in question, the victim testified the defendant "took my money, he ripped up my chain, and when I was walking out the door he tried to pull me back in by the hair." He also chased her with a knife.

In addition, the victim's mother testified that she witnessed the defendant's violent behavior toward the victim during the relationship. The mother testified that she saw black eyes, bruises, and other marks on

the victim, including the injury to the victim's mouth when the defendant burned her with the curling iron.

I think these acts are so shocking and horrific that the mere mention of them very likely aroused the jury's sense of horror, provoked its instincts to punish, and caused them to base its decision to convict on these acts rather than on the established propositions in the case. The fact that the prejudicial effect of the evidence of the prior assaults was somehow neutralized by the "equally reprehensible nature of the charged crime" is a red herring. *See United States v. Biswell,* 700 F.2d 1310, 1319 (10th Cir.1983) (holding that improper admission of bad-acts evidence, even in face of other evidence amply supporting verdict, impinged upon the fundamental fairness of the trial). The fact remains that without the prior and subsequent assault evidence the jury would have had no opportunity to convict the defendant based solely on this evidence. That brings me to the question of whether the probative value of the bad-acts evidence is substantially outweighed by the danger of unfair prejudice.

One authority describes why a balancing test is needed and the factors that go into such a test:

> [T]he fact that there is an accepted logical basis for the evidence other than the forbidden one of showing a proclivity for criminality does not preclude the jury from relying on a defendant's apparent propensity toward criminal behavior. Accordingly, most authority recognizes that the problem is not merely one of pigeonholing, but of classifying and then balancing. In deciding whether the danger of unfair prejudice and the like substantially outweighs the incremental probative value, a variety of matters must be considered, including the strength of the evidence as to the com-

mission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence will probably rouse the jury to overmastering hostility.

*McCormick on Evidence,* § 190, at 672–73 (John W. Strong ed., 5th ed. 1999); *see also Most,* 578 N.W.2d at 254.

This balancing test has been described as "the modern bastion of a long standing tradition that protects a criminal defendant from 'guilt by reputation' and from 'unnecessary prejudice.' " *United States v. Cook,* 538 F.2d 1000, 1004 (3d Cir.1976). And "[b]ecause the weighing entails competing interests, it is delicate, and must be employed with care lest accommodation to the prosecutor's needs results in subverting a principle that is central to our concept of fairness." *Id.* Otherwise, we allow the exceptions in rule 404(b) to swallow the important rule. *Id.*

In the context of this case, I think the two critical factors important to the weighing process, in light of the confinement issue, are the need for the evidence and the efficacy of alternative proof. I disagree with the majority when it says the prior assault evidence was necessary to prove confinement. To begin with, a careful review of the victim's testimony regarding the prior assaults does not support an inference that the defendant confined her on the occasions of these assaults.

Therefore, the only reason for such evidence was to show the defendant was a bad person and the jury should convict him because of such acts.

Additionally, the majority concedes the victim's testimony of the prior assaults was actually needed to bolster the victim's *credibility* on the issue of confinement.

This is an impermissible use of bad-acts evidence. *Mitchell,* 633 N.W.2d at 299–300.

Finally, there was other proof apart from the prior assaults from which inferences of confinement could be made. *See Most,* 578 N.W.2d at 254. First, there was the victim's direct testimony on the issue. Second, her testimony on the issue was bolstered by the testimony of a police officer and her mother as to her physical condition following the assault on October 11. Under the circumstances, the need for the bad-acts evidence was simply not established and its probative value was nominal at best. *See Cook,* 538 F.2d at 1003 ("The treasured principles underlying the rule against admitting evidence of other crimes should be relaxed only when such evidence is genuinely needed and would be genuinely relevant.") (quoting *United States v. Miller,* 500 F.2d 751, 763 (5th Cir.1974)).

To prevent the balancing process from becoming a mechanical process of allowing bad-acts evidence in just because it meets a rule 404(b) exception, there must be a "principled exercise of discretion." *Beasley,* 809 F.2d at 1279; *see also United States v. Lavelle,* 751 F.2d 1266, 1275 (D.C.Cir.1985) ("Introducing evidence of prior bad acts for a legitimate purpose, however, does not automatically cleanse the evidence of its unique quality of unfairly prejudicing the rights of the accused."). That means the trial judge "must both identify the exception that applies to the evidence in question and evaluate whether the evidence, although relevant and within the exception, is sufficiently probative to make tolerable the risk that jurors will act on the basis of emotion or an inference via the blackening of the defendant's character." *Beasley,* 809 F.2d at 1279; *see also Johnson,* 27 F.3d at 1193 ("[B]ecause prior acts evidence carries with it such a high risk of confusion and misuse ... there is a

heightened need for the careful application of the principles set out in rule 403."). There was no convincing evidence that that was done here. In fact, the record is barren of any mention by the trial court of any possible prejudice to the defendant. *Cf. Daly,* 623 N.W.2d at 802.

The trial court's failure to make an explicit finding on the probative value versus the prejudicial effect of the evidence and its failure to give a limiting instruction highlight the inadequate consideration given to the balancing process. *See Johnson,* 27 F.3d at 1193; *Back,* 588 F.2d at 1286. Such failure constitutes still another flaw in the balancing process here. *Cf. Daly,* 623 N.W.2d at 802 (holding that it was error for trial court not to engage in probative value verses prejudice balancing process under Iowa Rule of Evidence 609 regarding impeachment of criminal defendant for prior conviction).

The final flaw as I see it was the failure of the trial court to give a limiting instruction. Once the trial judge concludes that the balancing weighs in favor of admitting the evidence, the court should ordinarily instruct the jury carefully as to the limited purpose for which the evidence is admitted. *United States v. Sangrey,* 586 F.2d 1312, 1314 (9th Cir.1978). The advisory committee notes to Federal Rule of Evidence 403 require the trial judge to consider the effectiveness of a limiting instruction in reducing the prejudicial impact of evidence. Such an instruction is the only way to guard against the undue prejudice bad-acts evidence engenders. *United States v. Danzey,* 594 F.2d 905, 915 (2d Cir.1979). Otherwise the jury is left to its own devices. That usually means the jury will consider such evidence for an improper purpose—to convict based on the bad-acts evidence alone without regard to the limited purpose for which it was introduced.

Iowa Rule of Evidence 105 directs that when evidence is admissible for one purpose but not admissible for another purpose, "the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." The rule simply means that the court *must* instruct if requested. It makes no mention about a trial court's sua sponte obligation to give such an instruction as directed by the advisory committee notes to Federal Rule 403. The majority simply notes that the defendant did not request such an instruction and none was given. That does not answer the question whether the district court should have on its own considered giving the instruction. Given the nature of the bad-acts evidence, I think the only possible way to have avoided unfair prejudice was to give the instruction. Such an instruction, however, still would not have guaranteed the jury would have been able to erase the bad-acts evidence from its collective mind. *See Virgin Islands v. Toto,* 529 F.2d 278, 282–83 (3d Cir.1976); *State v. Castaneda,* 621 N.W.2d 435, 442 (Iowa 2001).

I conclude whatever probative value the bad-acts evidence had in this case was substantially outweighed by the danger of unfair prejudice engendered by the admission of such acts into evidence. Given all of the flaws in the balancing process, I conclude the trial court abused its discretion in admitting the evidence. I also conclude the admission of such evidence affected the defendant's substantial rights and constituted prejudicial error.

"To establish prejudice, [the defendant] must show a reasonable probability that but for the error the outcome of the trial would have been different." *State v. Crone,* 545 N.W.2d 267, 273 (Iowa 1996); s*ee also Tennison v. Circus Circus Enterprises, Inc.,* 244 F.3d 684, 688 (9th Cir.2001) ("A reviewing court should find prejudice only if it concludes that, more probably that not, the lower court's error tainted the verdict."). I cannot say that it is more probable than not that the bad-acts evidence introduced in this case did not affect the jury's verdict. *See Hodges,* 770 F.2d at 1481. I would affirm the decision of the court of appeals, reverse the district court judgment, and remand for a new trial.

CARTER, J., joins this dissent.