# IN THE COURT OF APPEALS OF IOWA

No. 3-1259 / 13-1421
Filed February 5, 2014

**CRISSY MARIE ARENS,**
        Petitioner-Appellee,

**vs.**

**THOMAS JOSEPH ARENS,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Delaware County, Thomas A. Bitter, Judge.


        Appellant-Respondent appeals from an order of protection issued pursuant to Iowa Code chapter 236 (2013).  **AFFIRMED.**


        Jacob Koller and Allison Slager of Simmons Perrine Moyer Bergman, P.L.C., Cedar Rapids, for appellant.

        Robert Sudmeier of Fuerste, Carew, Juergens & Sudmeier, P.C., Dubuque, for appellee.



        Considered by Vogel, P.J., and Tabor and McDonald, JJ.

**MCDONALD, J.**

Tom Arens appeals from a final domestic abuse protective order issued pursuant to Iowa Code chapter 236 (2013). The challenged order limits Tom's contact with his spouse Crissy Arens. On appeal, Tom challenges the sufficiency of the evidence supporting the finding that he committed domestic abuse assault against Crissy. We affirm.

I.

On August 2, 2013, Crissy filed her petition for relief from domestic abuse arising out of an incident between her and Tom occurring on July 10, 2013. The district court entered a temporary protective order and set the matter for hearing on the final protective order. Crissy and Tom each testified at the final hearing.

For some time before the incident occurring on July 10, Tom had suspicions Crissy was being unfaithful. When Tom arrived home on the evening of July 10, his daughter showed him text messages on Crissy's cell phone. The messages contained a photo of another man's penis and Crissy's request that the other man send another photo of his penis. At the same time Tom was viewing the text messages, Crissy was smoking a cigarette in the garage. When Crissy came back into the house from the garage, Tom asked her about the text messages. When confronted with the text messages, she demanded Tom return the cell phone to her; but he refused, stating that he was going to show the text messages to Crissy's father.

The parties' testimony about what occurred next is largely consistent. Crissy testified that she followed Tom throughout the house trying to prevent Tom from leaving with the cell phone in his possession:

> Q. Now, you've testified today that Tom wanted to leave the residence; correct? A. Yes, he had, I think—I'm pretty sure it was something with the booster club, and I believe [our son] had practice of some sort going on that evening.
> Q. So he just wanted to get out of there? A. Yes.
> Q. You kept following him around; correct? A. I asked for my phone back.
> Q. Right, and you followed him out the door; correct? A. Yes.
> Q. You jumped into his vehicle when he was trying to leave; correct? A. Yes.
> Q. He then went back into the home; correct? A. Yes.
> Q. And then the second time that he went to his vehicle, you followed him again; correct? A. Yes.
> Q. And then jumped into the back of the truck; correct? A. Yes.
> Q. And finally after several minutes, you chose to get out of the back of the truck and allow him to leave; correct? A. Yep.

Tom testified that Crissy ran after and chased him throughout the home and the area around the driveway for approximately twenty to twenty-five minutes in an attempt to get her cell phone back:

> Q. All right. So when you said—when you presented the phone or the photograph to Crissy, that was after she came in from the; garage? A. Yes.
> Q. And you were inside the house? A. Yes. Yes, I was.
> Q. All right. Did she request that you return the phone to her? A. Yes.
> Q. And is that when you indicated you were going to go show your father—or her father? A. I said I was going to show your dad what's been going on.
> Q. What happened after that? A. Well, she got wild, and she said, "I want that phone back." "I'm not going to give the phone back, I'm going to show your dad." Well, yeah, I don't know if I held the phone high or away from her, which I did, and then she just hit me on the elbow trying for me to drop the phone. I mean, it was awful. It's just awful. It is awful. And, yeah, we went around the

island I think, a couple times, and then I tried to leave. I went out through the garage and she followed me. Just keep going?

Q. Keep going. A. Okay. Well, she kept following me, and then yeah, I closed—I closed the door to try and get distance so I could get to my truck, but she was right on me. She was like—she'd lunge, she'd lunge to the door, and then she'd open the door and she'd be right on me, "Give me the phone, give me the phone." I said, "I'm not giving you the phone; I'm going to show your dad."

So if I remember, we went through the—went outside, there's one door, went out the garage, that's another door. Then I think I might have come in the front door of the house, that's one time, and then the second time, I did the same thing, you know, and every time she lunged because I went to lock the door to get me some distance so I can get to my truck to leave. Well, then the third time I got to my truck, and then, like she said, she jumped in the truck. I'm going down the driveway. Well, then I'm left-handed, I had the phone in my right hand, she jumped in the truck. I got out of the truck because she's right there, the phone's right here, so I go back up to the house. She's following me. I go in the house. Same thing, same thing the other way: Went in, she's on me, she's on me. Then I go up, I think, the front door, the truck's parked halfway down the driveway . . . and then I—I get in the truck. Well, then she tries—she's right there by the door, and she goes around the front of the truck. I hit the door lock quick so she couldn't get in. She jumped in the back of the truck. She sits there for I don't know how long, then finally she realized I wasn't going to give her the phone . . . so then she finally got out.

As Crissy was following Tom throughout the house, she sustained bruising to her arms and right hip as she ran into the doors that Tom closed behind him and the doorframes. Crissy also repeatedly initiated physical contact with Tom to try and take the phone from him, but she "could never get to [her] phone because [Tom] had it out of reach every time. He was always holding it out of reach where [Crissy] couldn't ever get to it."

She testified that on one occasion during the course of this chase, Tom grabbed her arms, told her that she was not "getting that f*cking phone back," and spit in her face. On cross examination, she stated that Tom was trying to

restrain her from getting her phone. Tom testified that the spitting was unintentional:

> Q. Your wife also testified that on July 10th of 2013, that at some point you spit on her; is that true? A. Well, at the—at the initial—at the initial conflict, she was right here trying to get that phone away. We were yelling and cussing and yelling. Yeah, something might have flew out of my—and hit her in the face.
> Q. How do you know that? Was there a reaction? A. Yeah, she leaned back.
> Q. At any point did you intentionally spit on her? A. No.
> Q. Was it a byproduct of the yelling that you were both doing at that time? A. Yes.

After hearing the testimony and reviewing the exhibits admitted into evidence, the district court stated,

> I'll be honest, I think it's a relatively close call on what happened that evening. I don't know what happened any more than your attorneys do or anybody else who wasn't there. All I can do is listen to the two of you and size the two of you up and try to make a determination about what I think happened, and Lord knows I could be wrong, but that's the job they've given me to do.

After making this statement, the district court found that Tom had no intent to commit an assault on Crissy by closing the doors behind him because that was "consistent with walking away and trying to leave." The district court did find by a preponderance of the evidence that Tom committed domestic abuse assault when Tom grabbed Crissy's arms and/or spit in her face.

## II.

We review a civil domestic abuse proceeding tried in equity de novo. *See Knight v. Knight*, 525 N.W.2d 841, 843 (Iowa 1994). We examine both the law and the facts, and we adjudicate anew those issues properly preserved and presented for appellate review. *See Wilker v. Wilker*, 630 N.W.2d 590, 594 (Iowa 2001). We give weight to the district court's findings, particularly its credibility

determinations, but our obligation to adjudicate the issues anew means that we will not rubber stamp what has gone before.

A party seeking a protective order pursuant to chapter 236 must prove by a preponderance of the evidence that a domestic abuse assault occurred. *See* Iowa Code §§ 236.4(1), 236.5 (providing that relief is available "[u]pon a finding that the defendant has engaged in domestic abuse"); *Wilker*, 630 N.W.2d at 596 (stating that the burden of proof is a preponderance of the evidence); *Knight*, 525 N.W.2d at 843. "Domestic abuse" means "committing an assault as defined in Iowa Code section 708.1" where the victim and assailant have a relationship governed by chapter 236, such as an assault involving "family or household members" or the "parents of the same minor child." Iowa Code § 236.3(2).

As relevant here, Iowa Code section 708.1(2) defines assault as follows:

> 2. A person commits an assault when, without justification, the person does any of the following:
> a. Any act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another, coupled with the apparent ability to execute the act.
> b. Any act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act.

Our supreme court has held that assault under section 708.1(2) requires proof of specific intent. *See State v. Fountain*, 786 N.W.2d 260, 266 (Iowa 2010); *State v. Bedard*, 668 N.W.2d 598, 601 (Iowa 2003). Specific intent is present when it is shown from the circumstances that the assailant subjectively desired the prohibited result. *See Fountain*, 786 N.W.2d at 264. To support a finding of assault, there thus must be sufficient proof that the defendant acted with the intent: (1) to cause pain or injury; (2) to make insulting or offensive physical

contact; or (3) to make the victim fear immediate painful, injurious, insulting, or offensive physical contact. *Id*; *see Wyatt v. Iowa Dep't of Human Svcs.*, 744 N.W.2d 89, 94 (Iowa 2008).

"Intent is a state of mind; it may be established by circumstantial evidence and by inferences drawn from that evidence." *State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995). In an assault allegation, the focus "is on the offender's intent, not the victim's expectations." *Bacon v. Bacon*, 567 N.W.2d 414, 418 (Iowa 1997). Whether the victim was afraid is not dispositive; "the focus of the assault statute is on the defendant, not the victim." *State v. Keeton*, 710 N.W.2d 531, 535 (Iowa 2006).

We begin our discussion by noting that we do have concerns regarding Crissy's credibility and her motivation in seeking relief under chapter 236. *See Cooper v. Cooper*, No. 03-0324, 2004 WL 61106, at *2 (Iowa Ct. App. Jan. 14, 2004) (Zimmer, J., concurring) (suggesting that motivation for filing chapter 236 petition was to gain advantage in dissolution proceeding rather than genuine fear for physical safety). Crissy filed her petition for relief from domestic abuse three weeks after the incident at issue and four days prior to signing and filing a petition for dissolution of the parties' marriage. The petition for relief from domestic abuse is a pre-printed form that contains several checkboxes in which the petitioner can request certain forms of relief. On the pre-printed form, Crissy did not request that Tom "stay away from my home/the family home." Nor did she request that Tom "stay away from my work or school." Nor did she request that Tom "not contact me either personally or through another person." Instead,

she requested temporary possession of the family home and car, temporary custody of the parties' children, and temporary financial support. Our concern is heightened because the record demonstrates that soon after the issuance of the final protective order, Crissy sought a modification of the order to allow her and Tom to have additional contact. Although we have concerns regarding Crissy's motivation in pursuing this action, the district court was also aware of these same issues and implicitly made a credibility determination. "Factual disputes depending heavily on the credibility of witnesses are best resolved by the trial court, which has a better opportunity to evaluate credibility than we do." *Claus v. Whyle*, 526 N.W.2d 519, 524 (Iowa 1994).

Tom contends there was insufficient evidence to prove assault because it was Crissy who was the aggressor during this confrontation. Tom does not argue that his conduct was justified within the meaning of section 708.1(2). Nor does he argue that he acted in self-defense. Thus, the undisputed fact that Crissy was the physical aggressor for most of the twenty to twenty five minute period while Tom was attempting to leave the residence is not material. The only issue on appeal is whether Tom's conduct in grabbing Crissy and/or spitting in her face constitutes domestic abuse assault. We conclude Crissy established by a preponderance of the evidence that Tom committed domestic abuse assault.

Crissy testified that Tom grabbed her arms with sufficient force to cause bruising. Pictures taken of her arms one week after the incident show Crissy's arms were still bruised. While some of the bruising was caused by Crissy running into the doors and doorframes, she testified that some of the bruising

was caused by Tom grabbing her. We can infer that Tom intended the natural consequences of his conduct. *See State v. Evans*, 671 N.W.2d 720, 724-25 (Iowa 2003) (noting a court may infer intent from the normal consequences of a party's actions); *State v. Rinehart*, 283 N.W.2d 319, 322-23 (Iowa 1979) (discussing the inference a person intends the natural consequences of voluntary acts); *see also State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995) ("Intent is a state of mind; it may be established by circumstantial evidence and by inferences drawn from that evidence."). Tom grabbing Crissy with sufficient force to cause bruising on her arms that lasted for more than one week is strong evidence of his intent to cause painful or injurious touching.

There is further evidence that Tom acted with the requisite intent. Crissy testified that Tom grabbed her arms, yelled "you ain't getting that f*cking phone back," and spit in her face. The fact that these three events occurred simultaneously strengthens the inference that Tom's conduct was intentional as opposed to accidental. *See State v. Taylor*, 689 N.W.2d 116, 126 (Iowa 2004) (noting an event, standing alone, might appear accidental, but when considered together with other acts and circumstances, suggest it was deliberate, not accidental); *see also Worthy v. Worthy*, No. 00-973, 2001 WL 246406, at *2 (Iowa Ct. App. Mar. 14, 2001) (finding that testimony of victim that assailant yelled at her, grabbed her throat, and spit on her was sufficient evidence to support a finding of domestic abuse assault).

There is additional evidence that Tom acted with the requisited intent. Crissy testified that Tom previously made threats against her and battered her.

*See Taylor*, 689 N.W.2d at 124-26 (finding evidence of prior assaults probative of intent); (*State v. Rodriguez*, 636 N.W.2d 234, 239 (Iowa 2001) (noting evidence of prior assaults was relevant to specific intent). Specifically, Crissy testified that Tom previously threatened that she would pay if he found out she was "screwing around or messing around." On another occasion, Crissy sustained a fat lip after Tom shoved a candlestick in her face. These past events are probative of Tom's intent in grabbing Crissy. These past events also militate in favor of finding that Tom intentionally—rather than inadvertently—spit in Crissy's face.

For the foregoing reasons, we conclude that Crissy carried her burden and established by a preponderance of the evidence that Tom committed domestic abuse assault within the meaning of Iowa Code chapter 236.

**AFFIRMED.**